## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| ALTRIA GROUP, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES OF AMERICA, )<br><br>Defendant. ) | Civil Action No.:   3:23cv293 |

## COMPLAINT

Plaintiff, Altria Group, Inc. ("Altria"), hereby brings this suit for a refund of U.S. Federal income taxes that were erroneously collected and illegally retained by Defendant, the United States of America ("Defendant"), and as the basis for this Complaint alleges as follows:

## NATURE OF THIS DISPUTE

1.      This action arises under the Internal Revenue Code of 1986, as amended and codified in Title 26 of the United States Code, for the recovery of U.S. Federal income taxes in the amount of $105,726,241, erroneously collected and illegally retained by Defendant for Altria's taxable year ending December 31, 2017 (the "2017 Tax Year"), plus statutory interest as allowed by law.

## THE PARTIES

2.      Altria is a company incorporated under the laws of the Commonwealth of Virginia.  Altria's principal office and mailing address for correspondence with the Internal Revenue Service (the "IRS") is 6601 W. Broad Street, Richmond, Virginia 23230.

3.      Altria's Federal Employer Identification Number is ████0245.

1

4.      Altria and certain subsidiaries filed a consolidated U.S. Federal income tax return on Form 1120, U.S. Corporation Income Tax Return, for the 2017 Tax Year (the "Original 2017 Tax Return").

5.      The Defendant is the United States of America.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 26 U.S.C. § 7422 and 28 U.S.C. § 1346(a)(1).

7.      Venue for this action properly lies in this District pursuant to 28 U.S.C. § 1402(a)(2).

8.      Altria timely filed its Original 2017 Tax Return with the IRS Service Center in Ogden, Utah.

9.      Altria timely and fully paid its U.S. Federal income tax liability for the 2017 Tax Year.  28 U.S.C. § 1346(a)(1); *Flora v. United States*, 362 U.S. 145 (1960).

10.     Altria timely filed a Second Restated and Amended Claim for Refund on July 18, 2019, with the IRS Service Center in Ogden, Utah, seeking a refund of taxes paid in the amount of $105,726,241 (the "Claim for Refund").  The Claim for Refund superseded two previously submitted claims for refund.  A true and accurate copy of the Claim for Refund is attached as Exhibit A.

11.     The Internal Revenue Service has not paid any refund or otherwise acted on the Claim for Refund, which was filed substantially more than six months ago.  26 U.S.C. § 6532(a)(1) permits Altria to file this suit for the refund of taxes sought in the Claim for Refund because the Internal Revenue Service has not acted on its claim for at least six months.  Altria is

2

in ongoing, productive discussions with the IRS regarding Issues 2-4 (identified below) and is hopeful that those discussions will obviate the need for trial on these issues.

## FACTUAL ALLEGATIONS

### Issue 1: Section 958(b)(4) Issue

### A.     Overview

12.     The central issue in this case relates to the taxation of Altria's investment in Anheuser-Busch InBev SA/NV ("ABI"), a publicly traded multinational brewing and beverage company based and incorporated in Belgium.

13.     Throughout the 2017 Tax Year, Altria owned more than ten percent of ABI's issued and outstanding shares of stock (by both vote and value).  As a result, Altria was a "U.S. Shareholder" of ABI within the meaning of section 951.[1]

14.     Altria understands the Government to contend that amendments to the Code enacted by the Tax Cut and Jobs Act of 2017 (the "TCJA") require Altria to pay tens of millions of dollars of U.S. federal income tax merely because Altria owned stock in ABI and certain of ABI's foreign subsidiaries earned income.[2]  Under the Government's view, Altria is taxed on income attributable to these ABI subsidiaries that it has not and may never receive.

15.     The Government's theory violates the United States Constitution and is contrary to the Code (even considering the TCJA amendments).  Both the Constitution and the Code

---

[1] Unless otherwise indicated, all "section" references herein are to the Internal Revenue Code of 1986, as amended and in effect during the applicable years, Title 26 of the U.S. Code (the "Code").

[2] The Government has not formally responded to Altria's Claim for Refund.  Thus, Altria's understanding of the Government's position is premised on public statements by the U.S. Department of the Treasury and statements made by the IRS examination team assigned to Altria.

prohibit the Government from taxing a shareholder's mere ownership of stock in a corporation and, instead, require that a shareholder actually, or constructively, realize income before being subject to tax.

16.     By default, shareholders are not taxed on the income earned by the corporation in which they own stock and, instead, are only taxed on the receipt of the corporation's dividends.

17.     Subpart F of the Code, sections 951 *et seq*., is a narrow exception to this default rule aimed at curbing certain potential abuses. In the absence of subpart F, U.S. taxpayers could place income-producing assets in a foreign corporation and defer U.S. tax on such income indefinitely (*i.e.*, neither the shareholder nor the foreign corporation would be subject to current U.S. tax).

18.     Subpart F mitigates this potential abuse by requiring U.S. Shareholders of a _controlled_ foreign corporation (a "CFC") to recognize certain types of income based on the CFC's earnings ("Subpart F Inclusions"), regardless of whether the U.S. Shareholders realize any income from the CFC in the form of a dividend. *See* Section 951.

19.     Critically, subpart F applies only where a U.S. Shareholder, or small group of U.S. Shareholders, _controls_ the foreign corporation. The control requirement is plainly set forth in the statutes that comprise subpart F and is essential to subpart F's constitutionality. When a U.S. taxpayer or small group of U.S. taxpayers control a foreign corporation, they are *deemed* to realize the foreign corporation's income; this is constitutional, because the taxpayer or taxpayers exercising control have the power to determine whether to realize that income through distributions or to avoid tax by deferring distributions. Absent such control, however, imputing the income earned by a corporation to its shareholder is unconstitutional and contrary to the Code.

20.     There is no dispute that Altria lacked the requisite control to cause ABI, or its foreign subsidiaries, to pay dividends.  Consequently, the Government's position violates the Constitution and is contrary to the Code.

### B.     Factual Background

21.     Throughout the 2017 Tax Year, Altria owned 185,115,417 restricted shares of ABI stock, which are not publicly traded, and 12,341,937 ordinary, publicly traded shares of ABI stock, for a cumulative total of 197,457,354 shares, which together constituted approximately 10.2 percent of ABI's issued and outstanding shares of stock.[3]

22.     In 2017, pursuant to ABI's Articles of Association, Altria had the ability to nominate two of the fifteen members of the ABI Board of Directors.  A true and accurate copy of ABI's Articles of Association as of December 31, 2017 is attached as Exhibit B.

23.     Altria entered into a Voting and Support Agreement with certain other material ABI shareholders.  Pursuant to the Voting and Support Agreement, the parties agreed to vote for the Directors that the others had nominated.  The scope of the Voting and Support Agreement, however, was limited to the election of Directors.  Once elected, Directors were not obligated to vote collectively on any matter presented to the Board.  A true and accurate copy of the Voting and Support Agreement is attached as Exhibit C.

24.     Altria and ABI also entered into an Information Rights Agreement and an initial Tax Matters Agreement (later amended and restated).  Together, these agreements permitted Altria to obtain certain financial information from ABI and to consult with ABI on certain tax matters.  These agreements did not, however, confer any control over ABI's activities or its

---

[3]     As of December 31, 2017, ABI had 2,019,241,973 issued shares, of which 85,541,785 were treasury shares, resulting in 1,933,701,581 shares issued and outstanding.  Altria's ownership of 197,457,354 shares represented 10.21% of this number of shares outstanding.

decisions to pay (or not pay) dividends.  True and accurate copies of the Information Rights

Agreement, the initial Tax Matters Agreement, and Amended & Restated Tax Matters

Agreement are attached as Exhibits D, E, and F, respectively.

25.     At all times, the two Altria-nominated Directors, in addition to the rest of the ABI

Directors, had a fiduciary obligation to act in the best interests of ABI shareholders.

26.     ABI's Articles of Association provided that Board decisions required approval

from a majority of the members.  *See* Exhibit B at Article 25.3, attached.  The two Altria-

nominated ABI Directors were among fifteen ABI Directors and thus lacked the requisite control

to direct ABI to take particular actions.

27.     The illustrative diagram below depicts the relevant aspects of Altria's interest in

ABI and ABI's structure.  The ABI subsidiaries on the right-hand side of the diagram in the

dashed box are the foreign subsidiaries with respect to which the Government contends Altria

owes tax.  These subsidiaries are referred to herein as the "ABI Wholly Foreign-Owned Subs."

The left-hand side of the diagram depicts a U.S. subsidiary of ABI (including the foreign

subsidiaries held under the U.S. subsidiary), referred to collectively herein as the "ABI U.S.

Subs."



28.     In 2017, other than Altria, no U.S. person, directly or indirectly, was a U.S. Shareholder with respect to the ABI Wholly Foreign-Owned Subs.

29.     In 2017, Altria did not control ABI or any of ABI's subsidiaries, including the ABI Wholly Foreign-Owned Subs and the ABI U.S. Subs.

### C.     Subpart F and the Control Requirement

30.      "Subpart F was enacted by Congress to limit the deferral of U.S. taxation of certain income earned outside the United States by foreign corporations controlled by U.S. persons."  T.D. 8767, 1998-16 I.R.B. 4, 4.  In the absence of subpart F, U.S. taxpayers could defer income simply by placing certain types of income-producing assets in a foreign corporation and preventing the foreign corporation from paying dividends to its U.S. owners.

31.     By its plain language, subpart F applies if and only if a U.S. person, or small group of U.S. persons, *controls* a foreign corporation.  26 U.S.C. § 951(a)(1) ("if a foreign corporation is a *controlled* foreign corporation . . . every United States Shareholder . . . shall include in his gross income . . . subpart F income . . . " (emphasis added)).  The details of this

control requirement are set forth in two statutory provisions, which together operate to ensure that subpart F complies with the requirements of the Constitution.

32.     First, section 957(a) requires that more than 50 percent of the vote or value of a foreign corporation be owned by "U.S. Shareholders" before a corporation may be considered a CFC.  The constitutionality of subpart F hinges on this element of control.

33.     The U.S. Department of Treasury, while advocating for subpart F, stated that "Congress has the power under the 16th Amendment to impose a tax on undistributed earnings of a foreign corporation *controlled* by U.S. shareholders on the ground that it may find that such income is constructively received by the U.S. shareholder. . ."  Memorandum from Robert H. Knight, U.S. Dep't of Treasury, to Secretary Dillon (June 12, 1961), *reprinted in President's 1961 Tax Recommendations: Hearings Before the H. Comm. on Ways & Means*, 87th Cong., 1st Sess., at 316 (1961) (emphasis added) ("Knight Memo.").  Thus, the control requirement was intended to ensure that a U.S. taxpayer (or small group of U.S. taxpayers) can control the actions of the foreign corporation, which directly aligns with Congress's purpose of curtailing taxpayer attempts at deferring income.

34.     Second, section 951(b) requires that only U.S. persons owning at least 10 percent of the foreign corporation's stock ("U.S. Shareholders") are considered in the more than fifty percent ownership requirement.  Thus, a foreign corporation that is owned by twenty unrelated U.S. persons, each holding five percent of the foreign corporation, does not qualify as a CFC, even though it is wholly owned by U.S. persons.  The ten percent ownership threshold was enacted to avoid "situations where ownership was widely scattered, and no U.S. group was in *effective control*." S. Comm. On Finance, 87th Cong., 2d Sess., Draft of Statutory Language, with Accompanying Explanation, of Amendments Proposed by the Secretary of the Treasury on

May 10, 1962, to Sections 13, 15, 16, and 20 of H.R. 10650, at 3 (Comm. Print 1962) (1962

Explanation of Treasury Draft) (emphasis added).

35.     These two rules remain in force (including after the TJCA amendments), and

when combined, operate to ensure that subpart F only applies in situations where U.S. persons

with a significant ownership stake control the foreign corporation.

36.     The constitutionality of subpart F hinges on this statutory control requirement.

The Constitution has long required that, to be subject to tax, one must actually or constructively

realize income.

37.     The Constitution provides that Congress can only impose a "direct tax" if that tax

is "apportioned among the several States in proportion to their respective [population]." U.S.

CONST. art. I, § 2, cl. 3; *see also id.* at § 9, cl. 4; s*ee also Pollock v. Farmers' Loan & Tr. Co.*,

157 U.S. 429 (1895), *on rehearing*, 158 U.S. 601 (1895) (holding that a "direct tax" includes a

tax on all forms of property, real and personal, and that a tax on income derived from property is,

in substance, a tax on the property because of ownership). The Sixteenth Amendment broadened

Congress's authority to impose unapportioned taxes, but only if the tax is imposed on "*income*."

U.S. CONST. amend. XVI.

38.     To receive "income" from a corporation, a shareholder must receive a distribution

of earnings. *Eisner v. Macomber*, 252 U.S. 189 (1920). Absent a distribution, there is no

income, the Sixteenth Amendment is inapplicable, and any tax imposed on undistributed

earnings is unconstitutional. *See id.* at 205-06.

39.     The Fifth Amendment to the Constitution further restricts Congress's authority to

tax. As relevant here, Courts have held that "any attempt . . . to measure the tax on one person's

property or income by reference to the property or income of another" violates a taxpayer's due process rights. *Hoeper v. Tax Comm'n of Wis.*, 284 U.S. 206, 215 (1931).

40. Congress maintained that subpart F was constitutional at the time of enactment, explaining that the constitutional realization requirement is not violated where U.S. Shareholders could be *deemed* to have "constructively received" a distribution from a CFC because such shareholders controlled the CFC. Knight Memo. at 316 (the constitutional realization requirement is not violated where "U.S. shareholders *controlled the foreign corporation* to the extent necessary to imply constructive receipt . . ." (emphasis added)). Courts have since upheld that position, reasoning that there is "no constitutional barrier to the taxation of [the CFC's] income to [U.S. Shareholders]," as subpart F only applies where U.S. persons retain "*complete* control" over the foreign corporation. *Estate of Whitlock v. Comm'r*, 59 T.C. 490, 507 (1972) (emphasis added) (citing *Helvering v. City Bank Co.*, 296 U.S. 85, 90 (1935)), *aff'd*, 494 F.2d 1297 (10th Cir. 1974); *see Garlock, Inc. v. Comm'r*, 58 T.C. 423 (1972), *aff'd in part*, 489 F.2d 197 (2d Cir. 1973); *see also Moore v. United States*, 36 F.4th 930 (9th Cir. 2022) (holding section 965 tax on undistributed foreign corporate earnings constitutional in case where U.S. shareholders had control over the foreign corporation), *petition for cert. docketed*, No. 22-800 (U.S. Feb. 23, 2023).

41. Consequently, absent control by U.S. Shareholders, the Constitution bars the Government from taxing U.S. Shareholders on corporate earnings of foreign corporations until those earnings are actually realized, most commonly in the form of dividends.

### D.     Stock Attribution Rules

42. Cognizant that taxpayers might disperse formal ownership, and therefore control, of a foreign corporation among related entities in an attempt to avoid the application of subpart F, Congress incorporated the stock ownership "attribution rules" in section 958(b).

43.     Under the attribution rules, stock formally owned by one person may be attributed to another, related person in determining whether a corporation is a CFC (*i.e.*, whether more than 50% of the corporation's stock is owned by U.S. Shareholders) and whether a shareholder is a U.S. Shareholder.

44.     For example, absent the attribution rules, a U.S. corporation owning fifty-one percent of a foreign corporation could subvert subpart F by placing one percent of its holdings in a wholly owned U.S. subsidiary.  The one percent subsidiary would not be a "U.S. Shareholder," and therefore, U.S. Shareholders would fall below the statutory requirement of more than fifty percent ownership.  The attribution rules prevent this result by treating the U.S. corporation as owning the one percent foreign stock interest of its wholly owned domestic subsidiary and treating the subsidiary as owning the stock of its parent.  The foreign subsidiary thus remains a CFC when the attribution rules apply.

45.     The attribution rules incorporated into subpart F were intentionally tailored to achieve the purposes of those provisions:  to prevent controlling *U.S.* Shareholders from using foreign corporations to defer *U.S.* tax.

46.     Such concerns, however, are generally not implicated where a *foreign* corporation, not subject to U.S. tax and thus without any incentive to defer U.S. tax, controls another foreign corporation.  Thus, subpart F originally included section 958(b)(4), which expressly prohibited the attribution of foreign corporation stock in fact owned by a foreign parent corporation down to the foreign parent's U.S. subsidiary ("downward foreign attribution").

47.     The rule prohibiting "downward foreign attribution" was generally consistent with the intent of subpart F.  For example, where a foreign parent corporation owns a U.S. subsidiary and foreign subsidiaries (as ABI does), "downward foreign attribution" would cause

the foreign subsidiaries to be treated as CFCs (as a result of the ownership attributed by the

foreign parent's U.S. subsidiaries) and any direct or indirect U.S. Shareholders (such as Altria) to

be taxed under subpart F, despite the U.S. Shareholders' absence of control.  Such a result is

inconsistent with the intended scope and purpose of subpart F.  That is precisely why, prior to the

TCJA, section 958(b)(4) explicitly prohibited downward attribution of a foreign person's stock

consistent with subpart F's control requirement.

### E.        The Repeal of Section 958(b)(4)

48.        On December 22, 2017, the TCJA was signed into law. Pub. L. No. 115-97, 131

Stat. 2054.  As explained below, the TJCA amended subpart F, but did not alter the plain

language of the statutes requiring that U.S Shareholders have control of a foreign company

before any tax is imposed.

49.        As relevant here, the TCJA repealed section 958(b)(4), which had explicitly

prohibited downward attribution of stock ownership from a foreign corporation to a U.S.

subsidiary, as described in paragraph 456.

50.        Congress intended the repeal of foreign attribution in 958(b)(4) to target a very

specific scenario—so-called "de-controlling" transaction structures, where a foreign-owned U.S.

corporation "de-controls" its own foreign subsidiary by transferring fifty percent or more of the

ownership of the foreign subsidiary to a related foreign corporation and eliminates the CFC

status of such foreign subsidiary.  If the prohibition on downward foreign attribution were in

effect, the foreign subsidiary would no longer qualify as a CFC, and the foreign corporation

would defer U.S. tax on the remaining ownership by the U.S. subsidiary, in contravention of the

policy rationale for subpart F.

51.        Congress repealed section 958(b)(4) in the TCJA to address these de-controlling

structures.  Pub. L. No. 115-97, § 14213(a).  Congress clearly expressed its intent, with respect to

the repeal of section 958(b)(4), to narrowly address structures resulting from "de-controlling" transactions and other similar structures that attempt to "convert[] former CFCs to non-CFCs, despite continuous ownership by U.S. shareholders."  H.R. Rep. No. 115-409, at 387 (2017); H.R. Rep. No. 115-466, at 507-508 (2017) (Conf. Rep.).

52.    The Senate Committee on Budget explicitly provided that the repeal of section 958(b)(4) was not intended to affect unrelated parties, and particularly not intended to affect situations such as Altria's investment in ABI:

> This provision [repealing section 958(b)(4)] is *not intended* to cause a foreign corporation to be treated as a controlled foreign corporation with respect to a U.S. shareholder as a result of attribution of ownership under section 318(a)(3) to a U.S. person that is not a related person (within the meaning of section 954(d)(3)) to such U.S. shareholder as a result of the repeal of section 958(b)(4).

S. Comm. on Budget, Reconciliation Recommendations Pursuant to H. Con. Res. 71, S. Rep. No. 115-20, at 383 (2017) (emphasis added).

53.    A Senate amendment to the TCJA was introduced to explicitly confirm that the intended effect of the repeal of section 958(b)(4) was limited in scope and that such repeal was not intended to create new CFCs (*e.g.*, the ABI Wholly Foreign-Owned Subs) with respect to unrelated U.S. Shareholders (*e.g.*, Altria).  The floor colloquy, and the response from Senator Hatch, the Chairman of the Senate Finance Committee is below:

> Mr. PERDUE.  Mr. President, I rise today to engage in a colloquy with my friend and colleague, the distinguished chairman of the Senate Finance Committee, Senator HATCH.  I would like to confirm my understanding of the modification of the section 958(b) stock attribution rules contained in the Tax Cuts and Jobs Act. The Senate Finance Committee explanation of this bill, as released by the Senate Budget Committee, definitively states, "This provision is not intended to cause a foreign corporation to be treated as a controlled foreign corporation with respect to a U.S. shareholder as a result of attribution of ownership under section 318(a)(3) to a U.S. person that is not a related person (within the meaning of Section 954(d)(3)) to such U.S. shareholder as a result of the repeal of section 958(b)(4)."  I would like to confirm that the conference report language did not change or modify the intended scope this statement. As you know, I filed an amendment to the Senate

bill, Senate amendment No. 1666 would have codified this explanatory text of the Finance Committee report. I also want to confirm that the Treasury Department and the Internal Revenue Service should interpret the stock attribution rules consistent with this explanation of the bill.

Mr. HATCH. The Senator is correct.  The conference report language for the bill does not change or modify the intended scope of the statement he cites.  The Treasury Department and the Internal Revenue Service should interpret the stock attribution rules consistent with this explanation, as released by the Senate Budget Committee.  I would also note that the reason his amendment No. 1666 was not adopted is because it was not needed to reflect the intent of the Senate Finance Committee or the conferees for the Tax Cuts and Jobs Act.  163 Cong. Rec. S8,110 (daily ed. Dec. 19, 2017).

54.     Congress's repeal of section 958(b)(4) must be interpreted in a manner consistent with its legislative intent, to permit downward attribution only in those situations specifically targeted by Congress:  to prevent a taxpayer from causing a CFC to lose its CFC status even though it remains under common control of the foreign-owned group and has continuing direct or indirect ownership by a U.S. Shareholder.

55.     Such an interpretation is consistent with the plain text and overall framework of the subpart F rules, which is premised on effective U.S. Shareholder control.  In particular, interpreting the repeal of section 958(b)(4) in this manner:

(i)     avoids conflict with the plain text of sections 951 and 957 (which require shareholder control);

(ii)    ensures consistency with the overall framework of subpart F, which is premised upon shareholder control (*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) (statutes must be interpreted consistent "with the design and structure of the statute as a whole.")); and

14

(iii)    ensures consistency with Congressional intent.  Indeed, adopting the Government's perspective yields absurd results—taxing Altria on its proportional share of all of the ABI Wholly Foreign-Owned Subs foreign income just because ABI happens to have a single U.S. subsidiary is absurd.  It is a "venerable principle that a law will not be interpreted to produce absurd results."  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 325 n.2 (1988) (Scalia, J., concurring).

56.    Moreover, this interpretation is consistent with the underlying constitutional requirements embedded in the plain text of the subpart F rules.  In particular, interpreting the repeal of section 958(b)(4) in this manner avoids conflict with the realization requirement in the Sixteenth Amendment to the U.S. Constitution.  *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) ("[a] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.").

### F.    Treatment of the ABI Wholly Foreign-Owned Subs

57.    The central issue in this case is whether, following the repeal of section 958(b)(4), Altria is required to treat its share of the earnings of the ABI Wholly Foreign-Owned Subs as "Subpart F Inclusions" and pay tax on those inclusions.

58.    Prior to the repeal of section 958(b)(4), the ABI Wholly Foreign-Owned Subs were not CFCs and Altria was not required to pay any tax on Subpart F Inclusions.

59.    There were no material changes to Altria's ownership or control of the ABI Wholly Foreign-Owned Subs.

60.    The Government, by its failure to respond, has constructively denied Altria's Claim for Refund.

15

61.     Altria understands the Government's position to be: (i) the attribution rules following the enactment of TCJA cause the ABI U.S. Subs to be treated as owning 100 percent of the ABI Wholly Foreign-Owned Subs through downward foreign attribution and, therefore, (ii) the ABI Wholly Foreign-Owned Subs are CFCs, ignoring the fact that neither the ABI U.S. Subs nor Altria controls the ABI Wholly Foreign-Owned Subs.

62.     Under the Government's theory, Altria is a U.S. Shareholder of ABI's Wholly Foreign-Owned Subs and, as a result, is required to report and pay tax on Subpart F Inclusions with respect to the ABI Wholly Foreign-Owned Subs, simply because it held an indirect 10.2 percent interest in them through its ownership interest in their foreign parent, ABI.

63.     In the 2017 Tax Year, Altria received semi-annual dividend payments paid to all ABI shareholders.  Altria's receipt of those distributions, however, is irrelevant to the Government's position in this case.  The Government would require Altria to pay the full amount of the tax described in Paragraph 62, even if Altria had received no distributions from ABI or its Wholly Foreign-Owned Subs.

64.     Applying downward foreign attribution in the case of Altria's investment in ABI disregards (i) the plain language of section 957(a), which requires that a foreign corporation be under the control of U.S. Shareholders, (ii) Congress's clearly expressed legislative intent in repealing section 958(b)(4), (iii) the Sixteenth Amendment to the Constitution, which permits only the taxation of income, (iv) the Fifth Amendment to the Constitution, which forbids the taxation of one person's property (Altria's shares in ABI) by reference to the property of another (the income of ABI's foreign subsidiaries), and (v) the absurdity of applying the downward attribution rule where no U.S. Shareholder, including Altria, had control of the ABI Wholly Foreign-Owned Subs.

16

### G.   Altria's Tax Reporting

65.     Altria timely filed its Original 2017 Tax Return consistent with Altria's understanding of the Government's position regarding the repeal of section 958(b)(4). Accordingly, Altria treated the ABI Wholly Foreign-Owned Subs as CFCs and reported and paid tax on its *pro rata* share of the related Subpart F Inclusions.

66.     Altria, as intended, subsequently filed its Claim for Refund, asserting that the ABI Wholly Foreign-Owned Subs cannot be treated as CFCs and seeking a refund of the tax paid on the Subpart F Inclusions in the amount of $38,002,682.

**Issue 2: Correction of Subpart F Inclusions Attributable to the ABI U.S. Subs**

67.     ABI also owns the ABI U.S. Subs, some of which own interests in foreign corporations that have historically been CFCs without regard to the repeal of section 958(b)(4) (the "ABI U.S. Sub CFCs").  Some of the stock of these CFCs is also owned directly by ABI or foreign subsidiaries that are brother/sister entities to the ABI U.S. Subs.

68.     Because of its ownership interest in ABI, Altria holds an indirect 10.2 percent interest in the ABI CFCs and is a U.S. Shareholder of the ABI U.S. Sub CFCs.

69.     On its Original 2017 Tax Return, Altria reported and paid taxes on Subpart F Inclusions attributable to the ABI U.S. Sub CFCs.  Altria is not challenging that it is liable for tax on Subpart F Inclusions from the ABI U.S. Sub CFCs, because the ABI U.S. Sub CFCs are controlled by U.S. persons.

70.     The Subpart F Inclusions reported on Altria's 2017 Original Tax Return reflected Altria's best estimates of the proper Subpart F Inclusions.

71.     Shortly before filing its 2017 tax return, Altria received supplemental information from ABI allowing it to determine Altria's correct Subpart F Inclusions with respect to the ABI

U.S. Sub CFCs. Altria did not have sufficient time to analyze that information and update its Original 2017 Tax Return by the filing deadline on October 15, 2018.

72.     After filing the Original 2017 Tax Return, Altria determined that it had overstated its Subpart F Inclusions with respect to CFCs held under the ABI U.S. Subs, resulting in an overstatement in its tax liability by $15,378,165, plus interest.

73.     In its Claim for Refund, Altria sought a refund of $15,378,165, based on the updated calculation, plus interest.

**Issue 3: Foreign Tax Credit**

74.     During its 2017 Tax Year, Altria received cash dividends from ABI (the "ABI Dividends").

75.     Altria was legally liable for and paid Belgian withholding tax on the ABI Dividends in the amount of $5,060,785 (the "Belgian Withholding Tax").  Pursuant to section 901, a U.S. taxpayer that pays or accrues an income tax to a foreign country generally may credit those taxes against its U.S. Federal income tax liability on foreign-source income, subject to certain limitations (a foreign tax credit ("FTC")).

76.     The Belgian Withholding Tax is a creditable foreign tax described in sections 901 and 903.

77.     Altria claimed the Belgian Withholding Tax paid in 2016 as a creditable foreign tax on its 2016 tax return, and the Service did not challenge this credit. The inadvertent omission of the Belgian Withholding Tax in 2017 was the result of Atria's focus on the complex new rules related to the TCJA, passed in December 2017, and applicable to the 2017 tax year filings.

78.     In its Claim for Refund, Altria claimed a refund in the amount of $5,060,785, plus interest, resulting from the fact that Altria underreported its FTC.

**Issue 4: Transition Tax**

79.     The TCJA created a new transition tax on the untaxed foreign earnings of certain deferred foreign income corporations ("DFICs") as if those earnings had been repatriated to the United States (the "Transition Tax").  *See* 26 U.S.C. § 965.  The Transition Tax was effective for the last taxable year of a DFIC beginning before January 1, 2018. 26 U.S.C. § 965(a).

80.     Altria received the requisite information from ABI to calculate its Transition Tax liability shortly before filing its Original 2017 Tax Return.  As a result, Altria did not have sufficient time to fully analyze the information before the filing deadline for its Original 2017 Tax Return.

81.     In addition, the rules related to the calculation of the Transition Tax were complex, and additional guidance was released on a rolling basis throughout 2018 and 2019.

82.     Following the filing of its Original 2017 Tax Return, and upon further analysis, Altria determined that it had overpaid its Transition Tax liability by $47,284,609 for its 2017 Tax Year.

83.     In its Claim for Refund, Altria claimed a refund on the basis that it had overstated its Transition Tax in the amount of $47,284,609.

### *Count One (Subpart F Inclusions Attributable to the ABI Wholly Foreign-Owned Subs)*

84.     Altria incorporates herein by reference and realleges all allegations in paragraphs 1 through 66.

85.     The repeal of section 958(b)(4) does not cause the ABI Wholly Foreign-Owned Subs to constitute CFCs with respect to Altria, because:

(a) The repeal of section 958(b)(4) must be read to avoid conflict with the plain language of section 957(a) and in concert with the plain language of subpart F as a whole, which impose tax only where U.S. Shareholders have control of a foreign corporation;

(b) The repeal of section 958(b)(4) must be read consistently with Congress's clearly expressed legislative intent;

(c) Subpart F and, in particular sections 957 and 958, must be interpreted to avoid absurd results—i.e., section 958 should not be read to extend subpart F to circumstances in which the U.S. Shareholder has no control over the foreign corporation when section 957 itself clearly requires such control; and

(d) Imposing tax under subpart F where, as here, the U.S. Shareholder has no control over a foreign corporation violates the Fifth and Sixteenth Amendments to the U.S. Constitution.

86. Therefore, Altria properly claimed a refund of $38,002,682 in the Claim for Refund for recovery of the tax that resulted from recognition of the Subpart F Inclusions attributable to the ABI Wholly Foreign-Owned Subs.

87. For the reasons set forth above, Altria is entitled to recover from Defendant the amount of $38,002,682, or such greater amount as is legally refundable, plus statutory interest as allowed by law.

### *Count Two – Subpart F Inclusions Attributable to the ABI Domestic Subsidiaries*

88. Altria incorporates herein by reference and realleges all allegations in paragraphs 1 through 11 and 67 through 73.

89.     On its Original 2017 Tax Return, Altria overstated its Subpart F Inclusions with respect to the ABI U.S. Subs by $32,299,614.

90.     Once Altria's Subpart F Inclusions are corrected, Altria is entitled to a refund of $15,378,165, or such greater amount as is legally refundable, plus statutory interest as allowed by law.

### Count Three – Foreign Tax Credit for the Belgian Withholding Tax

91.     Altria incorporates herein by reference and realleges all allegations in paragraphs 1 through 11 and 74 through 78.

92.     Pursuant to section 901, Altria is entitled to an FTC equal to the amount of the Belgian Withholding Tax, or $5,060,785.

93.     Altria is therefore entitled to recover from Defendant the amount of $5,060,785, or such greater amount as is legally refundable, plus statutory interest as allowed by law.

### Count Four – Transition Tax

94.     Altria incorporates herein by reference and realleges all allegations in paragraphs 1 through 11 and 79 through 83.

95.     On its Original 2017 Tax Return, Altria overstated and overpaid its Transition Tax liability.

96.     Therefore, Altria is entitled to recover from Defendant the amount of $47,284,609, or such greater amount as is legally refundable, plus statutory interest as allowed by law.

### PRAYER FOR RELIEF

WHEREFORE, Altria prays for judgment in its favor and against Defendant as follows:

1.      That Altria be refunded the total sum of $105,726,241 with regard to the overstatements of income, unclaimed credits, and overstatements of tax described above for the 2017 Tax Year, or such greater amount as is legally refundable, plus statutory interest as allowed by law;

2.      That Altria be awarded its costs of this action; and

3.      That Altria be granted such other and further relief as this Court deems appropriate.

Dated: May 1, 2023

/s/Edward Fuhr
Edward J. Fuhr (VSB No. 28082)
Johnathon E. Schronce (VSB No. 80903)
Hunton Andrews Kurth LLP
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: 804-788-8201
Facsimile: 804-788-8218
efuhr@hunton.com
jschronce@hunton.com


Rajiv Madan*
Christopher Bowers*
Royce Tidwell*
Paige Braddy*
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, DC  20005
Telephone:   (202) 371-7000
Facsimile:   (202) 393-5760
Email:   raj.madan@skadden.com
         chris.bowers@skadden.com
         royce.tidwell@skadden.com
         nathan.wacker@skadden.com
         paige.braddy@skadden.com

*Attorneys for Plaintiff Altria Group, Inc.*


* Pending Application to Qualify as a Foreign Attorney Under Local Rule 83.1(D).