# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**ALTRIA GROUP, INC.,**

      **Plaintiff,**

   **v.**                                 **Civil Action No. 3:23cv293**

**UNITED STATES OF AMERICA,**

      **Defendant.**

## MEMORANDUM OPINION

This matter comes before the Court on the United States' Motion for Judgment on the Pleadings on Count I of Altria's Complaint (the "Motion for Judgment on the Pleadings" or "Motion"). (ECF No. 53.) Plaintiff Altria Group, Inc. ("Altria") responded in opposition and the United States replied. (ECF Nos. 56, 65.)

The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process. For the reasons articulated below, the Court will grant the Motion. (ECF No. 53.)

## I. Factual and Procedural Background

### A.    Factual Background[1]

Altria and the United States dispute the amount of federal taxes Altria owed for the 2017 Tax Year due to its investment in Anheuser-Busch InBev SA/NV ("ABI"). (ECF No. 1 ¶¶ 1, 9–14.)

Altria is a Virginia corporation. (ECF No. 1 ¶ 2.) ABI is "a publicly traded multinational brewing and beverage company based and incorporated in Belgium." (ECF No. 1 ¶ 12.) ABI has a complex corporate structure, owning both foreign subsidiaries (the "ABI Wholly Foreign-Owned Subs" or "Contested CFCs"[2]) and American subsidiaries (the "ABI U.S. Subs" or "Non-Contested CFCs"). (ECF No. 1 ¶ 27.)

Throughout the 2017 Tax Year, Altria owned "approximately 10.2 percent of ABI's issued and outstanding shares of stock." (ECF No. 1 ¶ 21.) In that year, no other United States person or entity, "directly or indirectly, was a U.S. [s]hareholder with respect to" the Contested CFCs. (ECF No. 1 ¶ 28.)

Paragraph 27 of Altria's Complaint contains a diagram of ABI's structure and Altria's interest in ABI. "The ABI subsidiaries on the right-hand side of the diagram in the dashed box are the foreign subsidiaries with respect to which the [United States] contends Altria owes tax", i.e., the Contested CFCs. (ECF No. 1 ¶ 27).

---

[1] For purposes of this Motion, the Court will accept the well-pleaded factual allegations in the Complaint, (ECF No. 1), as true and draw all reasonable inferences in favor of Altria. *See, e.g.*, *Plantan v. Smith*, No. 3:22cv407 (MHL), 2023 WL 3358312, at *1 n.4 (E.D. Va. May 10, 2023). Because the Motion only requests judgment as to Count One, the facts recounted are limited to the facts relevant to Count One.

[2] As will be discussed in detail below, a "CFC" is a "Controlled Foreign Corporation" that is defined in the tax code. (ECF No. 1 ¶ 18.)

2

(ECF No. 1 ¶ 27 (yellow and pink highlighting, arrows, and "Contested CFC 1" and "Contested CFC 2" labels added for emphasis and clarity).)

Altria "timely filed its Original 2017 Tax Return." (ECF No. 1 ¶ 65; *see also* ECF No. 1-1, at 2.) When it filed its 2017 tax return, Altria understood that because Altria owned 10.2 percent of ABI's stock, the United States treated the Contested CFCs as foreign corporations "controlled" by Altria. (ECF No. 1 ¶65.) As a result, Altria expected the United States to attribute the income of these Contested CFCs to Altria for purposes of calculating Altria's tax

liability. (ECF No. 1 ¶ 14.) Adhering to the United States' theory, Altria "paid [$38,002,682 in] tax on its pro rata share" of the Contested CFCs' income. (ECF No. 1 ¶ 65.)

Altria disagreed with the United States that, because of Altria's 10.2 percent ownership of ABI, the income of the Contested CFCs should be attributed to Altria for the purposes of its tax bill. As a result, on January 17, 2019, Altria filed its original Claim for Refund with the Internal Revenue Service ("IRS"), "asserting that the [Contested CFCs] cannot be treated as CFCs and seeking a refund of the tax [Altria] paid." (ECF No. 1 ¶ 65; ECF No. 1-1, at 2.) On February 12, 2019, Altria filed its First Amended Claim for Refund, and on July 18, 2019, Altria filed its Second Restated And Amended Claim for Refund (the "Second Amended Refund Claim.") (ECF No. 1-1, at 2.) Altria's Second Amended Refund Claim again asserts that the Contested CFCs "cannot be treated as CFCs." (ECF No. 1 ¶ 66.) Altria's Second Amended Refund Claim seeks a tax refund of $38,002,682. (ECF No. 1 ¶ 66.) To date, "[t]he Internal Revenue Service has not paid any refund or otherwise acted on the" Second Amended Refund Claim. (ECF No. 1 ¶ 11.)[3]

### B.    Procedural Background

On May 1, 2023, Altria filed this action against the United States seeking a refund of federal income taxes for the 2017 Tax Year. (*See generally*, ECF No. 1.) Relevant to the Motion, which requests judgment solely as to Count One, Altria challenges the inclusion of its pro rata share of the Contested CFCs' income in its 2017 federal taxable income. (ECF No. 1

---

[3] As of the date Altria filed the Complaint, over six months had elapsed since it filed its July 18, 2019 Second Amended Claim for Refund. (ECF No. 1 ¶¶ 10–11.) Pursuant to 26 U.S.C. § 6532, in pertinent part, "[n]o suit or proceeding . . . for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim[.]" § 6532(a)(1). Thus, Altria's tax refund claim is ripe for judicial review.

¶¶ 57, 65–66, 85–87.)  In Count One of the Complaint, Altria contends that it "properly claimed a refund of $38,002,682 in the [Second Amended Refund Claim] for recovery of the tax that resulted from" this inclusion, and requests from the United States "$38,002,682, or such greater amount as is legally refundable, plus statutory interest as allowed by law." (ECF No. 1 ¶¶ 86–87.)[4]

On August 2, 2023, the United States filed an Answer to the Complaint.  (ECF No. 27.) On November 9, 2023, the Court stayed this matter "pending [the United States] Supreme Court decision in *Moore v. United States*, No. 22-800." (ECF No. 35, at 1.)  On June 20, 2024, the Supreme Court decided *Moore*.  *See* 602 U.S. 572 (2024).  As a result, the Court lifted the stay. (ECF No. 70.)

After *Moore* was decided, the United States filed the instant Motion for Judgment on the Pleadings.  (ECF No. 53.)  Altria responded in opposition and the United States replied.  (ECF Nos. 56, 65.)  For the reasons articulated below, the Court will grant the Motion.  (ECF No. 53.)

## II.  Legal Standard

### A.  Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial[.]" Fed. R. Civ. P. 12(c).  "A motion for judgment on the pleadings under Rule 12(c) is assessed under the same standards as a motion to dismiss under Rule 12(b)(6)." *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 243

---

[4] The Complaint contains three remaining Counts:  Counts Two, Three, and Four.  (ECF No. 1, at 20–21.)  Altria notes in its Complaint that it "is in ongoing, productive discussions with the IRS regarding [Counts] 2–4 . . . and is hopeful that those discussions will obviate the need for trial on these issues." (ECF No. 1 ¶ 11.)

(4th Cir. 1999)). "A Rule 12(c) motion for judgment on the pleadings therefore is also analyzed for compliance with the Supreme Court's holdings in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)." *Trs. of Columbia Univ. in City of New York v. Symantec Corp.*, 425 F. Supp. 3d 601, 607 (E.D. Va. 2019) (citations omitted).

"It is axiomatic . . . that for purposes of the court's consideration of the Rule 12(c) motion, all of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false." 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER., FEDERAL PRACTICE AND PROCEDURE § 1368 (3d ed. 2023) (citing cases). Similar to a Rule 12(b)(6) motion, the Court must view all "the inferences to be drawn [from the facts] in the light most favorable to the nonmoving party." *Id.* "To survive a motion for judgment on the pleadings, a pleading need only provide a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *United States v. Sum of Three Hundred Nine Million Five Hundred Thousand Dollars*, 85 F. Supp. 3d 111, 115 (D.D.C. 2015) (citing *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).

### III. Analysis

At issue in the United States' Motion are the rules concerning the attribution of foreign corporations' income to domestic corporations. Prior to 2017, the Internal Revenue Code prevented the United States from attributing the income of certain foreign corporations to certain domestic corporations. In 2017, Congress enacted the Tax Cuts and Jobs Act (the "TCJA"), which removed this prohibition. In its Motion, the United States argues that, as a result of this

6

repeal, the income of ABI's foreign subsidiaries is properly attributed to Altria, such that Altria's

tax payment of $38,002,682 was valid.

Specifically, the United States seeks judgment on the pleadings as to Count I, arguing

that Altria's tax challenge fails on both statutory and constitutional grounds. The United States

succeeds in all respects. (ECF No. 54, at 11.) First, the United States argues that the plain

language of the Internal Revenue Code, as amended by the TCJA, unambiguously requires Altria

to include the income of the Contested CFCs in its 2017 tax filing, does not produce an absurd

outcome in doing so and, as a result, no canon of statutory interpretation or legislative history

leads to a different conclusion. (ECF No. 54, at 11.) Second, the United States contends that

applying the Internal Revenue Code in this manner does not violate the United States

Constitution's Fifth Amendment's Due Process Clause[5] because it furthers a legitimate

legislative purpose, and therefore is not arbitrary. (ECF No. 54, at 29–33.) Finally, the United

States maintains that the substantial variance doctrine bars Altria's Fifth Amendment Due

Process Clause argument to the extent it is based on Altria's lack of control over ABI or the

Contested CFCs. The Supreme Court rejected these arguments in *Moore*, and this Court does so

here. (ECF No. 54, at 35; ECF No. 65, at 34.)

Accepting Altria's factual allegations as true and drawing all reasonable inferences in its

favor, as the Court must do at this procedural juncture, the Court will grant the Motion. (ECF

No. 53.) First, the Court will discuss the relevant statutory framework found in subpart F of the

---

[5] The Fifth Amendment to the United States Constitution provides, in relevant part:

No person shall be . . . deprived of life, liberty, or property, without due process of
law; nor shall private property be taken for public use, without just compensation.

U.S. CONST. AMEND. V.

7

Internal Revenue Code.[6]  Second, the Court will address the parties' competing statutory arguments, which center around whether Congress' repeal of 26 U.S.C. § 958(b)(4) produces an absurd result that is incompatible with subpart F.  (ECF No. 54, at 11, 17–20, 27–28; ECF No. 56, at 12–45.)  For the reasons stated below, Congress' repeal of § 958(b)(4) is unambiguous and does not produce an absurd result.  Against this backdrop, despite Altria's argument to the contrary, it would be inappropriate for the Court to import any additional "control" requirement that is not present in the statutory text itself.

Third and finally, the Court will evaluate Altria's argument that taxing it on attributed income from the Contested CFCs—entities it does not control—is arbitrary in violation of the Fifth Amendment's Due Process Clause.  (ECF No. 56, at 45–56.)  Altria's Due Process Clause argument also fails.  As a threshold matter, the Court will consider the entirety of Altria's Due Process Clause argument on the merits.  The United States argues that "[u]nder the substantial variance doctrine, '[a]ny legal theory not expressly or impliedly contained in the application for refund cannot be considered by a court in which a suit for refund is subsequently initiated.'"  (ECF No. 54, at 35.)  However, drawing all reasonable inferences in favor of Altria, Altria's Second Amended Refund Claim put the IRS on adequate notice that the concept of "control" is a fundamental predicate of Altria's tax dispute, and would be an issue at play for its Fifth Amendment claim.  As a result, to the extent Altria's Fifth Amendment argument is based on its lack of control over ABI or the Contested CFCs, it is not barred by the substantial variance doctrine.

---

[6] "Subpart F", as will be discussed in more detail below, governs the taxation of Controlled Foreign Corporations, and comprises Sections 951 through 965 of the Internal Revenue Code, which is codified as Title 26 of the United States Code. *See* 26 U.S.C. § 951– 965.  Throughout this Memorandum Opinion, all statutory citations unless otherwise identified are to the Internal Revenue Code, i.e., to "26 U.S.C."

Altria's Fifth Amendment claim fails on the merits, however, for two reasons. First, Congress acted with a legitimate purpose to prevent tax avoidance. Second, highly persuasive guidance provided by the Supreme Court in *Moore* bolsters the conclusion that Altria's tax is constitutional even where Altria lacks control over ABI or the Contested CFCs.

### A.    Statutory Framework: Subpart F of the Internal Revenue Code Post-TCJA and *United States v. Moore*

In 1962, Congress enacted subpart F of the Internal Revenue Code. *See Moore*, 602 U.S. at 579 (citing §§ 951–952). It is titled "Subpart F – Controlled Foreign Corporations." Subpart F of the Internal Revenue Code, 26 U.S.C. §§ 951 *et seq.*, governs the taxation of Controlled Foreign Corporation ("CFC") income. *See* §§ 951 *et seq.* "In the absence of subpart F, U.S. taxpayers could place income-producing assets in a foreign corporation and defer U.S. tax on such income indefinitely." (ECF No. 1 ¶ 17.) Subpart F "mitigates this potential abuse by requiring U.S. Shareholders of a [CFC] to recognize certain types of income based on the CFC's earnings . . . , regardless of whether the U.S. Shareholders realize any income from the CFC in the form of a dividend." (ECF No. 1 ¶ 18.) That is, subpart F attributes the income of these CFCs to certain United States shareholders.

Altria challenges the United States' attribution of the income of ABI's subsidiaries to Altria. Specifically, Altria challenges the inclusion of its pro rata share of the Contested CFCs' income in its 2017 federal taxable income. (ECF No. 1 ¶¶ 57, 65–66, 85–87.) To analyze this challenge, the Court begins with a discussion of CFCs and the rules governing the attribution of income.

### 1.    Controlled Foreign Corporations ("CFCs") and U.S. Shareholders

The TCJA did not alter any of the definitions relevant to the United States' Motion. Subpart F defines a CFC as "any foreign corporation [where] more than 50 percent of" the

9

corporation by vote or value "is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b)," by United States shareholders on any day in its taxable year. § 957(a). Put differently, if more than 50 percent of a foreign corporation's owners are "United States shareholders," then subpart F treats the foreign corporation as "controlled" by those United States shareholders. That is, the foreign corporation is a CFC.

A "United States shareholder" is "a United States person . . . who owns . . . or is considered as owning . . . 10 percent or more of the total combined voting power of all classes of stock entitled to vote of [a] foreign corporation, or 10 percent or more of the total value of shares of all classes of stock of [a] foreign corporation." § 951(b). United States "persons" include domestic corporations. *See* § 7701(a)(30)(C).

Both the definition of a "CFC" and the definition of a "United States shareholder" depend on whether a certain amount of stock is "owned." The definition of "ownership" is therefore key in determining whether the CFCs at issue here are, in fact, CFCs. The Internal Revenue Code has additional rules, described below, dictating what constitutes "ownership" of a foreign corporation's stock.

### 2.    Subpart F's Stock Ownership and Attribution Rules Post-TCJA

Subpart F contemplates three kinds of "ownership": direct ownership, indirect ownership, and constructive ownership. *See* § 958. Whether the Contested CFCs at bar are in fact CFCs involves an analysis of each of these categories of ownership.

The first category, direct ownership, occurs when an entity owns "directly" the stock of another. § 958(a)(1)(A). For example, applying Altria's diagram, Altria *directly* owns 10.2 percent of ABI stock. The second category, indirect ownership, occurs when a domestic entity

owns a foreign entity, and the foreign entity in turn owns stock. § 958(a)(1)(B), (a)(2). Again

applying Altria's diagram, Altria *indirectly* owns, through its 10.2 percent stake in ABI, a portion

of ABI Subsidiary (U.S.). The third category, constructive ownership, occurs in several

circumstances, outlined below. § 958(b).

### a.    Upward Attribution (Proportionate Attribution)

Section 958(b) defines "constructive ownership" of stock. Constructive ownership of

stock consists of "upward attribution" and "downward attribution." Section 318(a)(2)(C)

outlines "upward attribution":

> If 50 percent or more in value of the stock in a corporation is owned, directly or
> indirectly, by or for any person, such person shall be considered as owning the stock
> owned, directly or indirectly, by or for such corporation, in that proportion which
> the value of the stock which such person so owns bears to the value of all the stock
> in such corporation.

§ 318(a)(2)(C). The Court provides its own diagram below explaining § 318(a)(2)(C):



In the diagram above, A, B, Red, and Blue are shareholders and corporations.

Shareholder A owns 51 percent of the stock of Corporation Red. Shareholder B owns 49 percent

of the stock of Corporation Red. Corporation Red owns 100 percent of the stock of Corporation

Blue. Applying § 318(a)(2)(C), because Shareholder A owns more than 50 percent of the stock

of Corporation Red, Shareholder A *constructively* owns 51 percent of Corporation Red's

ownership of 100 percent Corporations Blue's stock. This is called "upward attribution." *See* Bittker and Eustice, Fed. Income Tax'n of Corp. & Shareholders Chapter 9.02, Constructive Ownership of Stock: § 318, 1999 WL 516561, at *3 (Mar. 2025). Corporation Red's ownership of Corporation Blue's stock flows "upward" to Shareholder A. Note that Shareholder A *also owns* 51 percent of Corporation Blue *indirectly*, as well as *constructively*, through its ownership of Corporation Red. § 958(a)(1)(B), (a)(2).

Section 958(b) modifies the upward attribution rules in two additional ways. First, § 958(b)(2) provides that if a "corporation owns, directly or indirectly, more than 50 percent of the total combined voting power of all classes of" a corporation's voting stock, it is considered to own *all* of the voting stock. § 958(b)(2). In the example above, if Shareholder A were a corporation, § 958(b)(2) would treat Shareholder A as owning *completely* Corporation Red's ownership of Corporation Blue stock, because Shareholder A owned more than 50 percent of Corporation Red's stock.

Second, § 958(b)(3) substitutes "the phrase '10 percent' . . . for the phrase '50 percent' used in" § 318(a)(2)(C). § 958(b)(3). In other words, pursuant to § 958(b)(3), if a U.S. person[7] owns 10 percent or more of the value of a foreign corporation's stock, subpart F considers that U.S. person to proportionally own the stock owned by the corporation.

### b.    Downward Attribution (Full Attribution)

Section 318(a)(3)(C) outlines "downward attribution":

> If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, such corporation shall be considered as owning the stock owned, directly or indirectly, by or for such person.

---

[7] As noted above, for the purposes of subpart F, a "United States person" includes, *inter alia*, domestic corporations. *See* 26 U.S.C. § 7701(a)(30)(C).

§ 318(a)(3)(C). The Court has provided its own diagram below explaining § 318(a)(3)(C):



In the diagram above, A, Orange, and Green are corporations. Corporation A directly owns 51 percent of Corporation Orange. Corporation A also directly owns 100 percent of Corporation Green. Applying § 318(a)(3)(C), because Corporation A owns greater than 50 percent of Corporation Orange's stock, Corporation A's ownership of Corporation Green stock is attributed to Corporation Orange. That is, Corporation A's ownership of Corporation Green stock flows "downward" to Corporation Orange. This is called "downward attribution." *See* Bittker and Eustice, Fed. Income Tax'n of Corp. & Shareholders Chapter 9.02, Constructive Ownership of Stock: § 318, 1999 WL 516561, at *3 (Mar. 2025) (explaining that "[u]nder § 318(a)(3), stock owned, directly or indirectly, by . . . shareholders is attributed in full to the . . . corporation.)

### c.    Downward Attribution Post-TCJA

"On December 22, 2017, the TCJA was signed into law." (ECF No. 1 ¶ 48 (citing Pub. L. No. 115-97, 131 Stat. 2054).) The TCJA repealed § 958(b)(4) in subpart F, which formerly read: "subparagraphs (A), (B), and (C) of section 318(a)(3) shall not be applied so as to consider a United States person as owning stock which is owned by a person who is not a United States person." *See* § 958(b)(4) (repealed Dec. 22, 2017, Pub. L. No. 115-97 § 14213(a), 131 Stat.

2054, 2217 ("striking paragraph (4)" in § 958(b))).  Phrased differently, prior to the TCJA, subpart F explicitly prevented the downward attribution of stock ownership from a foreign corporation to a domestic corporation.  After the TCJA's repeal of § 958(b)(4), however, the plain language of § 958 no longer prevents this.  Rather, post-TCJA, when determining under subpart F whether a foreign corporation is a CFC and whether a U.S. Person is a U.S. shareholder, stock owned by a foreign person is downwardly attributed to *any* corporation of which that foreign person owns more than 50 percent.  *See* § 958.

### 3.  <u>Subpart F Post-*Moore v. United States*</u>

As noted above, on November 9, 2023, the Court stayed this matter "pending [the United States] Supreme Court decision in *Moore v. United States*, No. 22-800." (ECF No. 35, at 1.)  On June 20, 2024, the Supreme Court decided *Moore*.  *See* 602 U.S. 572 (2024).  As a result, the Court lifted the stay.  (ECF No. 70.)

Relevant to *Moore*, the TCJA "imposed a one-time, backward-looking tax . . . known as the Mandatory Repatriation Tax or MRT."  *Moore*, 602 U.S. at 580 (citing § 965).)  "[T]he MRT attributed the long-accumulated and undistributed income of American-controlled foreign corporations to American shareholders, and then taxed those American shareholders on their pro rata shares of that long-accumulated income at a rate from 8 to 15.5 percent."  *Id.* (citing §§ 965(a), (c), (d)).

In *Moore*, the petitioners challenged the constitutionality of the MRT under Article I,

§§ 8 and 9 and the Sixteenth Amendment[8] of the U.S. Constitution, arguing that it constitutes a

tax on unrealized income. *See* 602 U.S. at 578, 580. The *Moore* Court rejected this argument,

explaining that "[c]ritically, . . . the MRT *does* tax realized income—namely, income realized by

the corporation." *Id.* at 584 (emphasis in original). In *Moore*, the Court concluded that

"Congress may attribute an entity's realized and undistributed income to the entity's

shareholders or partners, and then tax the shareholders or partners on their portions of that

income." *Id.*[9] In reaching this conclusion, the Supreme Court noted that its "longstanding

precedents plainly establish that, when dealing with an entity's undistributed income, Congress

may tax either (i) the entity or (ii) its shareholders or partners." *Id.* 589–90.

**B.      Post-TCJA, the Plain Language of § 958(b) Dictates that Altria Must be
         Taxed on its Proportional Share of the Contested CFCs' Subpart F Income**

Despite Altria's insistence to the contrary, determining (1) whether a foreign corporation

is a CFC, and (2) whether an entity is a U.S. shareholder for the purposes of subpart F taxation,

are both objective, mathematical questions. When making these determinations, this Court

cannot, and will not, impose any additional control requirement presented by Altria that is not in

---

[8] The Sixteenth Amendment to the United States Constitution provides:

> The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration.

U.S. CONST. AMEND. XVI.

[9] Altria's Complaint includes an argument that "[a]pplying downward foreign attribution in the case of Altria's investment in ABI" violates "the Sixteenth Amendment to the Constitution, which permits only the taxation of income." (ECF No. 1 ¶ 64.) Altria has informed the Court that "[a]s a result of the *Moore* decision, [it] will no longer pursue its argument that the tax at issue violates the Sixteenth Amendment to the U.S. Constitution." (ECF No. 40, at 4.)

the statutory text itself. Applying the plain language of subpart F, Altria is a U.S. shareholder that is attributed under subpart F to own 10.2 percent of the Contested CFCs. As a result, it must be taxed on its pro rata share of the Contested CFCs' subpart F income. Furthermore, because the relevant portions of subpart F are unambiguous and do not create an absurd result, the legislative history of subpart F cannot alter this conclusion.

      **1.**    **Pursuant to the Plain Language of § 958(b), the Contested CFCs are CFCs**

As noted above, paragraph 27 of Altria's Complaint contains a diagram of ABI's structure and Altria's interest in ABI. That diagram is included below:



(ECF No. 1 ¶ 27 (yellow and pink highlighting, arrows, and "Contested CFC 1" and "Contested CFC 2" labels added for emphasis and clarity).)

16

The Court will begin, as it must, with the plain language of the statute. *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654 (2020); *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011). The Court will apply the plain language of § 958(b) to analyze whether the two Contested CFCs are in fact CFCs. The Court will first turn to the Contested CFC at the top of the yellow dashed box, which the Court has labeled "Contested CFC 1." The Court will then turn to the Contested CFC at the bottom of the yellow dashed box, which the Court has labeled "Contested CFC 2." For the reasons articulated below, Altria and ABI Subsidiary (U.S.) are each U.S. shareholders of Contested CFC 1 and Contested CFC 2 (collectively, the "Contested CFCs"). The Contested CFCs are both CFCs.

### a.      Contested CFC 1 is a CFC

Again, subpart F defines a CFC as "any foreign corporation [where] more than 50 percent of" the corporation by vote or value "is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b)," by United States shareholders on any day in its taxable year. § 957(a). "Ownership" includes direct ownership, indirect ownership via foreign entities, and constructive ownership. *See* §§ 958(a)(1)–(2), 958(b).

Relevant to subpart F's definition of a CFC, a "United States person" includes, *inter alia*, domestic corporations. *See* § 7701(a)(30)(C). A "United States shareholder" constitutes a United States person who owns "10 percent or more of the total combined voting power of all classes of stock entitled to vote of such foreign corporation, or 10 percent or more of the total value of shares of all classes of stock of such foreign corporation." § 951(b). Thus, to determine whether Contested CFC 1 is a CFC, the Court must first identify its U.S. shareholders.

17



### i.    Shareholder Analysis:  Contested CFC 1

At an attempt toward clarity, the Court adds notation to Altria's diagram above.  The

diagram reflects that Altria is a U.S. shareholder of Contested CFC 1.  ABI owns 100 percent of

Contested CFC 1.  (ECF No. 1 ¶ 27.)  Altria owns 10.2 percent of ABI.  (ECF No. 1 ¶ 27.)[10]

Through this 10.2 percent ownership interest in ABI, Altria also indirectly owns 10.2 percent of

_____

[10] Specifically, for the 2017 Tax Year, Altria owned "approximately 10.2 percent of
ABI's issued and outstanding shares of stock."  (ECF No. 1 ¶ 21.)

ABI's 100 percent ownership of Contested CFC 1, rendering it a U.S. shareholder of Contested CFC 1. *See* §§ 951(b); 958(a)(1)(B), (a)(2). The Court depicts Altria's indirect ownership of Contested CFC 1 stock through the blue arrow marked in the textbox labelled "(1)".

ABI Subsidiary (U.S.), highlighted in pink in the above diagram, is also a U.S. shareholder of Contested CFC 1. ABI owns 100 percent of Contested CFC 1. (ECF No. 1 ¶ 27.) The Court depicts ABI's direct ownership of Contested CFC 1 stock through the green arrow marked in the textbox labelled "(2)". ABI owns 100 percent of ABI Subsidiary (U.S.), i.e., more than 50 percent. (ECF No. 1 ¶ 27.) The Court depicts ABI's direct ownership of ABI Subsidiary (U.S.) stock through the orange arrow marked "(3)". Because ABI owns more than 50 percent of ABI Subsidiary (U.S.), ABI's ownership of Contested CFC 1's stock flows "downward" to ABI Subsidiary (U.S.). §§ 958(b), 318(a)(3)(C). The Court depicts the result of this downward attribution through the red arrow marked in the textbox labelled "(4)". And because ABI Subsidiary (U.S.) constructively owns more than 10 percent ABI's 100 percent ownership of Contested CFC 1, ABI Subsidiary (U.S.) is a U.S. shareholder of Contested CFC 1. § 951(b).

### ii.    CFC Analysis:  Contested CFC 1

Having concluded that Contested CFC 1 has two U.S. shareholders—Altria and ABI Subsidiary (U.S.), the Court now turns to the question of whether Contested CFC 1 is in fact a CFC. Subpart F defines a CFC as "any foreign corporation [where] more than 50 percent of" the corporation by vote or value "is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b)," by U.S. shareholders on any day in its taxable year. § 957(a). Here, U.S. shareholder ABI Subsidiary (U.S.) constructively owns 100 percent of ABI's 100 percent ownership of Contested CFC 1, and U.S. shareholder Altria constructively owns 10.2 percent of ABI's 100 percent ownership of Contested CFC 1. Thus,

19

more than 50 percent of Contested CFC 1 is owned by U.S. shareholders. As a result, Contested

CFC 1 is in fact a CFC. § 957(a).

        **b.**       **Contested CFC 2 is a CFC**

Next, the Court turns to the question of whether Contested CFC 2 is a CFC. Applying

the same law and logic applied immediately above, Contested CFC 2 is also a CFC.



        **i.**       **Shareholder Analysis:  Contested CFC 2**

To assess the status of Contested CFC 2, the Court separately adds different notations to

Altria's diagram. To determine whether Contested CFC 2 is a CFC, the Court must first identify

its U.S. shareholders. Altria is a U.S. shareholder of Contested CFC 2. ABI owns 100 percent of

Contested CFC 1. (ECF No. 1 ¶ 27.) Contested CFC 1 owns 100 percent of Contested CFC 2. (ECF No. 1 ¶ 27.) ABI, as 100 percent owner of Contested CFC 1, has indirect and constructive ownership of 100 percent of Contested CFC 1's 100 percent ownership of CFC 2. *See* §§ 318(a)(2)(C),[11] 958(a)(1)(B), 958(a)(2). Altria, in turn, indirectly owns 10.2 percent of Altria's 100 percent ownership of Contested CFC 2, rendering it a U.S. shareholder of Contested CFC 2. *See* §§ 951(b), 958(a)(1)(B), 958(a)(2). The Court depicts Altria's indirect ownership of Contested CFC 2 stock through the blue arrow marked in the textbox labelled "(1)".

ABI Subsidiary (U.S.) is also a U.S. shareholder of Contested CFC 2. ABI owns 100 percent of Contested CFC 1. (ECF No. 1 ¶ 27.) The Court depicts ABI's direct ownership of Contested CFC 1 stock through the green arrow marked in the textbox labelled "(2)". Contested CFC 1 owns 100 percent of Contested CFC 2. (ECF No. 1 ¶ 27.) The Court depicts Contested CFC 1's direct ownership of Contested CFC 2 stock through the black arrow marked in the textbox labelled "(3)". Because ABI owns 100 percent of Contested CFC 1, ABI owns or is considered to own 100 percent of Contested CFC 1's 100 percent ownership of Contested CFC 2. *See* §§ 318(a)(2)(C), 958(a)(1)(B), 958(a)(2). The Court depicts ABI's indirect ownership of Contested CFC 2 stock through the purple arrow marked in the textbox labelled "(4)". Again, ABI also owns 100 percent of ABI Subsidiary (U.S.), i.e., more than 50 percent. (ECF No. 1 ¶ 27.) The Court depicts ABI's direct ownership of ABI Subsidiary (U.S.) stock through the orange arrow marked "(5)". Through downward attribution, ABI Subsidiary (U.S.) constructively owns 100 percent of ABI's 100 percent ownership of Contested CFC 2, rendering

---

[11] The Court observes that § 958(b)'s modifications to the upward attribution rules of § 318(a)(2)(C) would likely apply in this circumstance as well. *See* §§ 958(b)(2)–(3). But because the baseline upward attribution rules of § 318(a)(2)(C) apply, the Court need not address these modifications.

it a U.S. shareholder of Contested CFC 2. *See* §§ 318(a)(3)(C), 951(b), 958(b). The Court depicts the result of this downward attribution through the red arrow marked in the textbox labelled "(6)".

### ii.    CFC Analysis:  Contested CFC 2

Having concluded that Contested CFC 2 has two U.S. shareholders—Altria and ABI Subsidiary (U.S.)—the Court now turns to the question of whether Contested CFC 2 is in fact a CFC. Subpart F defines a CFC as "any foreign corporation [where] more than 50 percent of" the corporation by vote or value "is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b)," by U.S. shareholders on any day in its taxable year. § 957(a). Here, U.S. shareholder ABI Subsidiary (U.S.) constructively owns 100 percent of ABI's 100 percent ownership of Contested CFC 2, and U.S. shareholder Altria indirectly owns 10.2 percent of ABI's 100 percent ownership of Contested CFC 2. Thus, more than 50 percent of Contested CFC 1 is owned by U.S. shareholders. As a result, Contested CFC 2 is in fact a CFC. *See* § 957(a).

### c.    Altria's Arguments Against Concluding that the Contested CFCs are CFCs Do Not Persuade

Altria contends that for the purposes of determining a CFC, "the [United States] has argued, and courts have agreed, that" subpart F contains a "control requirement [that] is a substance-based inquiry and *not* purely mechanical." (ECF No. 56, at 13 n.4 (emphasis in original) (citing *Koehring Co. v. United States*, 583 F.2d 313, 317 (7th Cir. 1978); *Kraus v. Commissioner*, 490 F.2d 898 (2d Cir. 1974); *Garlock, Inc. v. Commissioner*, 489 F.2d 197, 199–200 (2d Cir. 1973); and *Est. of Weiskopf v. Commissioner*, 64 T.C. 78 (1975), *aff'd without published opinion*, 538 F.2d 317 (2d Cir. 1976))); (*see also* ECF No. 56, at 21–23). These citations, however, are all examples of courts applying Treas. Reg. § 1.957-1(b)'s anti-abuse

provisions to *increase* the scope of what constitutes a CFC under § 957(a) in instances of attempted taxpayer manipulation, even where an entity did not fall within § 957(a)'s literal definition of a CFC.  *See Koehring*, 490 F.2d at 317, 324–25; *Kraus*, 490 F.2d at 901, 903; *Garlock*, 489 F.2d at 200; *Weiskopf*, 64 T.C. at 93–94.  Some courts have described these cases as applying the "substance-over-form doctrine."  *See Framatome Connectors U.S., Inc. v. Comm'r*, 118 T.C. 32 (2002), *aff'd sub nom. Framatome Connectors USA, Inc. v. Comm'r*, 108 F. App'x 683 (2d Cir. 2004).  But such anti-abuse provisions are necessary and logical given that the purpose of subpart F is to prevent the indefinite deferral of certain foreign income in CFCs.

For example, the United States Court of Appeals for the Seventh Circuit in *Koehring* applied Treas. Reg. § 1.957-1(b)'s anti-abuse provisions to conclude that the taxpayer's voting arrangement constituted an intentional structuring to avoid subpart F.  *See* 583 F.2d at 317.  In so doing, the Seventh Circuit did not find any control requirement within § 957's definition of a CFC.  Rather, it explained how Treas. Reg. § 1.957-1(b) prevents taxpayer manipulation, remarking that "[n]ot surprisingly, the Treasury Regulations relating to Section 957 require that in certain circumstances[,] the nominal distribution of voting power will be ignored when it is not consistent with the reality of control."  *Id.*  Similarly, in *Weiskopf*, the United States Tax Court applied Treas. Reg. § 1.957-1(b)'s anti-abuse provision to conclude that a voting arrangement gave an entity CFC status even where it "[did] not come within the literal definition of controlled foreign corporation" found in section 957(a).  *See* 64 T.C. at 93–94.  In applying Treas. Reg. § 1.957-1(b) to reach this conclusion, the Tax Court "rel[ied] heavily" on *Garlock* and *Krauss*.  *See id.* at 93–94.

Altria's citation to *Framatome* founders for similar reasons.  (ECF No. 56, at 23 n.54).  In *Framatome*, a taxpayer structured an arrangement to avoid CFC status, and then later sought

CFC status when such status provided a previously unavailable tax advantage. *See* 118 T.C. at 46–48. The Tax Court rejected this attempt, explaining that while the Tax Commissioner is permitted to rely on Treas. Reg. § 1.957-1(b) and invoke the substance-over-form doctrine "to recharacterize a transaction according to its substance", a taxpayer cannot utilize this doctrine "to disavow a transactional form of the taxpayer's own choosing." *Framatome*, 118 T.C. at 47 ("'It would be quite intolerable to pyramid the existing complexities of tax law by a rule that the tax shall be that resulting from the form of transaction taxpayers have chosen or from any other form they might have chosen, whichever is less.'") (quoting *Television Indus., Inc. v. Comm'r*, 284 F.2d 322, 325 (2d Cir. 1960)).

At bottom, anti-abuse provisions found in the Treasury Regulations are applied in limited situations to *prevent* tax avoidance, not facilitate it. Here, the Contested CFCs fall within the plain language of § 957(a)'s definition of a CFC, and there are no allegations that Altria intentionally structured any transaction to avoid the application of subpart F. While Altria argues it should do so, (*see* ECF No. 56, at 17–21), this Court will not jump to a finding that the existence of anti-abuse provisions, IRS guidance applying them, and the IRS-favorable doctrine of substance over form require this Court to import an additional control requirement that is wholly absent from the statutory text itself.

Altria, however, argues that "the substantive inquiry under subpart F is not a one-way street for only the Government to invoke in its favor."[12] (ECF No. 56, at 23); *but see*

---

[12] Again, the Court takes issue with Altria's characterization of subpart F. It is more accurate to say that the application of subpart F (and specifically the interpretation of § 957(a)'s definition of a CFC), is an objective, mechanical test. Again, existing alongside § 957(a)'s definition of a CFC are anti-abuse provisions found in Treas. Reg. § 1.957- 1(b). The anti-abuse provisions found in Treas. Reg. § 1.957-1(b) are of limited relevance to this case where the Contested CFCs fall under the plain language of subpart F and there are no allegations that Altria intentionally structured any transaction to avoid the application of subpart F.

*Framatome*, 118 T.C. at 47–48 (taxpayers cannot invoke the substance-over-form doctrine to recharacterize their own tax planning to avoid taxes).  In support of this contention, it identifies a *single*, fifty-year-old Tax Court case, *CCA, Inc. v. Commissioner*, 64 T.C. 137 (1975).[13]  In *CCA*, the Tax Court conducted "a comprehensive analysis of the evidence" to determine whether there was "a meaningful ownership of at least 50 percent of the voting power of [a contested CFC] by non-United States shareholders."  64 T.C. at 150.  In *CCA*, the Tax Court ultimately rejected the Tax Commissioner's CFC classification determination, finding that no express agreements or understandings existed as to how the preferred shareholders would vote their shares.  *Id.* at 147.  Since its publication fifty years ago, only one case has cited to *CCA*.  It does so without endorsing *CCA*'s approach.  *See Koehring*, 583 F.2d at 324, 324 n.13 (observing that in comparison to *CCA*, the facts before the Seventh Circuit fell "more forcefully within traditional sham doctrine principles with regard to the transfer of control", with the panel expressly noting that "[w]e do not mean to imply that we would necessarily agree with the tax court's analysis in *CCA, Inc.* if a similar situation were presented to us.")

---

[13] Altria also cites to cases that it concedes are "[o]utside of the subpart F context."  (ECF No. 56, at 24, 24 n.59 (citing *Goudas v. Commissioner*, 72 T.C.M. (CCH) 1540, 1996 WL 732829 (1996) at *7–8 (reviewing the substance of the transaction and the entire record to determine the sales price of commercial property), *aff'd*, 137 F.3d 368 (6th Cir. 1998); *see also Coulter Elecs., Inc. v. Commissioner*, 59 T.C.M. (CCH) 350, 1990 WL 40058 (1990) (where the original agreement was "ambiguous", the agreement provisions plus "all relevant documents and the overall conduct of the parties" indicated "a loan relationship rather than a sale"), *aff'd without published opinion*, 943 F.2d 1318 (11th Cir. 1991).)  Legal determinations of the appropriate sales price of a commercial property or the terms of a "clearly ambiguous" contract are far too divorced from the facts and relevant statutory framework at bar to persuade the Court to impute a substantive, control-based requirement in subpart F's tax regime.

### 2. Because Both Contested CFCs are in Fact CFCs, the Plain Language of § 951 Dictates that Altria Must be Taxed on its Proportional Share of the Contested CFCs' Subpart F Income

Applying the plain language of § 958, the Court has concluded that Altria is a U.S. shareholder of Contested CFC 1 and 2, and that both entities are in fact CFCs. In so doing, the Court has also determined that Altria indirectly owns 10.2 percent of the stock of both Contested CFC 1 and 2. With these findings in mind, the Court now turns to the plain language of subpart F to examine how this ownership interest affects Altria's gross income calculation.

Section 951 dictates the amounts to be included in a U.S. shareholder's taxable income. *See* § 951. It provides, in pertinent part, that U.S. shareholders of a CFC must include their "pro rata share . . . of the corporation's subpart F income[.]" § 951(a)(1)(A). Section 958 provides that "stock owned" means stock owned both directly and indirectly within the meaning of that section. § 958(a). In other words, when calculating a U.S. shareholder's pro rata share of a CFC's income, the United States considers direct and indirect ownership. Here, where Altria indirectly owns 10.2 percent of the stock of Contested CFC 1 and Contested CFC 2, it must include in its 2017 federal gross income calculation its 10.2 percent pro rata share of the Contested CFCs' subpart F income. § 951(a)(1)(A).

### 3. The Plain Text of Subpart F Unambiguously Lacks An Additional Control Requirement

Altria objects to including in its gross income calculation its 10.2 percent pro rata share of the Contested CFC' subpart F income. It argues that "[a]t the heart of subpart F is the requirement that the foreign corporation be *controlled* by U.S. taxpayers." (ECF No. 56, at 13 (emphasis in original).) It asks the Court to require "control in substance" before concluding that a corporation is in fact a CFC, arguing that to do otherwise is contrary to "the plain text of

subpart F" as well as the principle that "tax statutes must be interpreted substantively and in accord with economic reality." (ECF No. 56, at 13–14.)

Where the plain text of subpart F is unambiguous, however, the Court may not import the additional control requirement proffered by Altria to narrow U.S. shareholders' tax liability. *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment. After all, only the words on the page constitute the law adopted by Congress and approved by the President."); *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it . . . . When presented, on the one hand, with clear statutory language and, on the other, with dueling committee reports, we must choose the language). Simply put, "legislative history can never defeat unambiguous statutory text." *Bostock*, 590 U.S. at 674.

Here, subpart F explicitly and unambiguously applies to U.S. shareholders, which it defines as a United States person[14] who owns "10 percent or more of the total combined voting power of all classes of stock entitled to vote of [a CFC], or 10 percent or more of the total value of shares of all classes of stock of such foreign corporation." § 951(b). Subpart F's rules determining stock ownership are found in § 958, which the Court applied to the facts alleged in this case to conclude that Altria indirectly owns 10.2 percent of the Contested CFCs' stock.

As explained above, the TCJA repealed § 958(b)(4) in subpart F, which formerly read: "subparagraphs (A), (B), and (C) of section 318(a)(3) shall not be applied so as to consider a United States person as owning stock which is owned by a person who is not a United States

---

[14] As noted above, a "United States person" includes domestic corporations. *See* 26 U.S.C. § 7701(a)(30)(C).

person." *See* § 958(b)(4) (repealed Dec. 22, 2017, Pub. L. No. 115-97 § 14213(a), 131 Stat. 2054, 2217). Phrased differently, prior to the TCJA, subpart F explicitly prevented the downward attribution of stock ownership from a foreign corporation to a domestic corporation. After the TCJA's repeal of § 958(b)(4), however, the plain language of § 958 no longer prevents this. Rather, post-TCJA, when determining under subpart F whether a foreign corporation is a CFC and whether a U.S. Person is a U.S. shareholder, stock owned by a foreign corporation is attributed to any corporation of which that foreign corporation owns more than 50 percent. *See* § 958.

The crux of Altria's position is a dogged attempt to partially revive the wholesale repeal of § 958(b)(4), with Altria referring to this repeal throughout its briefing as merely an "amendment", (*see, e.g.*, ECF No. 56, at 31), and arguing that Congress amended § 958(b)(4) only "to target a very specific scenario—so-called 'de-controlling' transaction structures, where a foreign-owned U.S. corporation 'de-controls' its own foreign subsidiary by transferring fifty percent or more of the ownership of the foreign subsidiary to a related foreign corporation and eliminates the CFC status of such foreign subsidiary." (ECF No. 1 ¶ 50; *see also* ¶¶ 51–54; ECF No. 56, at 32.)[15, 16]

---

[15] Altria further argues in its Complaint that "interpreting the repeal of section 958(b)(4) in this manner avoids conflict with the realization requirement in the Sixteenth Amendment to the U.S. Constitution." (ECF No. 1 ¶ 56.) As noted above, Altria stated that "[a]s a result of the *Moore* decision, [it] will no longer pursue its argument that the tax at issue violates the Sixteenth Amendment to the U.S. Constitution." (ECF No. 40, at 4.)

[16] The United States argues that, to the extent legislative history is relevant at all to this dispute, Altria's cherry-picked sources ignore the fact that "Congress' wholesale repeal of section 958(b)(4) reflects the House bill, the Senate amendment, and the Conference agreement," (ECF No. 65, at 24), meaning that isolated excerpts cannot carry the day.

The Court is unable to credit this argument where the TCJA wholly struck paragraph 4 from § 958(b). *See* § 958(b)(4) (repealed Dec. 22, 2017, Pub. L. No. 115-97 § 14213(a), 131 Stat. 2054, 2217 ("striking paragraph (4)" in § 958(b))). In the absence of this paragraph from § 958(b), the plain text of subpart F unambiguously applies to Altria. The facts alleged in Altria's Complaint, assumed to be true at this procedural juncture, render it liable for its pro rata share of the Contested CFCs' subpart F income.

Because "legislative history can never defeat unambiguous statutory text", *Bostock*, 590 U.S. at 674, absent a literal reading of subpart F producing an absurd result, the Court cannot, and will not, wade through the parties' dueling interpretations of the legislative history of the TCJA and Congress' repeal of § 958(b)(4). *See Milner*, 562 U.S. at 574; *Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 304 (4th Cir. 2000), *aff'd sub nom. Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002). The Court now turns to the question of whether a literal reading of subpart F produces an absurd result.

### 4.    Taxing Altria on Its Proportional Share of the Contested CFCs' Subpart F Income Does Not Create an Absurd Result

Altria argues the United States' "interpretation of the [downward] attribution rules produces myriad absurd consequences and evidences the arbitrariness of its position." (ECF No. 56, at 42.) At base, Altria argues that it is absurd for it to be left with substantial tax liability for "wholly foreign-derived income" as a "minority shareholder" of ABI[17], where Altria has "no corporate relationship" with, or control over, ABI or its subsidiaries. (ECF No. 56, at 42–45.)

An outcome is "absurd" when it is "so gross as to shock the general moral or common sense." *Sigmon Coal*, 226 F.3d at 304 (cleaned up). "[S]uch instances are, and should be,

---

[17] It is undisputed that ABI is not a CFC. (ECF No. 54, at 41; ECF No. 56, at 43.)

exceptionally rare." *Id.*; *see also Barnhart*, 534 U.S. at 450 (citing with approval *Sigmon*'s proposition that courts "are not simply free to ignore unambiguous language because [courts] can imagine a preferable version.") (quotation marks and citation omitted).

Here, applying the post-TCJA version of subpart F to Altria and its foreign investments does not produce the rare "absurd" result that is "so gross as to shock the general moral or common sense." *Sigmon Coal*, 226 226 F.3d at 304 (cleaned up). In support of its argument to the contrary, Altria cites two cases involving the taxation of foreign-derived income earned through foreign corporations: (1) *Alvord v. Commissioner*, 277 F.2d 713 (4th Cir. 1960); and (2) *Marsman v. Commissioner*, 205 F.2d 335 (4th Cir. 1953).[18] Neither case supports a conclusion that the Court's literal interpretation of subpart F post-TCJA to the facts of this case would create an absurd result.

Both *Alvord* and *Marsman*, unlike here, involved courts declining a literal read of a tax statute to avoid irrational results that would not further the purpose of either statute. In *Alvord*, the United States Court of Appeals for the Fourth Circuit dealt with a portion of the tax law that had the "immediate purpose" of forcing U.S. shareholders to obtain "annual distributions in dividends of holding company net income." 277 F.2d at 718. The Fourth Circuit declined to

---

[18] Altria also cites to three statutory interpretation cases (none of which are related to the tax issues at bar) where courts concluded that the statute at-issue should be read in a manner that avoids an absurd result. (*See* ECF No. 56, at 39–42.) These cases are useful for the general, and undisputed, proposition that the statutory rule against absurdity remains good law. Because these cases are not related to the tax issues involved here, however, they are of limited persuasive value beyond that general proposition. *See, e.g., Lynch v. Jackson*, 853 F.3d 116, 122 (4th Cir. 2017) (reading bankruptcy statute in a manner that would avoid the "absurd result" of "punishing frugal debtors"); *Campbell v. Hampton Rds. Bankshares, Inc.*, 925 F. Supp. 2d 800, 809–10 (E.D. Va. 2013) (reading removal statute to avoid the "absurd" result of permitting removal based on merely "a technicality in a literal reading of" the removal statute); *United States v. Mitchell*, 691 F. Supp. 2d 665, 671 (E.D. Va. 2010) (reading criminal statute in a manner to avoid absurd result of "greater sentences for lesser offenses than for grave offenses.").

read that portion of the tax law literally to avoid the absurd result of "prevent[ing] the act the statute was designed to compel." *Id.* at 719.

In *Marsman*, the Fourth Circuit dealt with a portion of the tax law that was passed "to prevent the avoidance of income tax by taxpayers in the United States which was accomplished by placing income of the taxpayer in the hands of a foreign holding company that was itself not subject to the jurisdiction of the United States." 205 F.2d at 340. The Fourth Circuit would not rely on only a literal reading of the tax statute where doing so would "reach the income of persons, such as alien nonresidents, which was not subject to the laws of the United States when it was received by them or by a holding company subject to their control," because reaching this income was not intended by Congress. *Id.* The Fourth Circuit explained that this would "not only extend[] the statute far beyond its announced purpose, but it" also would make the law inconsistent, as it would "treat[] the taxpayer and the corporation as distinct legal persons during the first part of the year but as one and the same person after the taxpayer acquired her residence in the United States." *Id.*

Here, the Court's literal interpretation of subpart F post-TCJA applied to the facts of this case requires Altria to include in its gross taxable income its pro rata share of the Contested CFCs' subpart F income. This outcome does not contravene subpart F's purpose. As Altria explains in its Complaint, ordinarily, "shareholders are not taxed on the income earned by [a] corporation in which they own stock and, instead, are only taxed on the receipt of the corporation's dividends." (ECF No. 1 ¶ 16.) Subpart F "is a narrow exception to this default rule aimed at curbing certain potential abuses. In the absence of subpart F, U.S. taxpayers could place income-producing assets in a foreign corporation and defer U.S. tax on such income indefinitely." (ECF No. 1 ¶ 17.) "Subpart F mitigates this potential abuse by requiring U.S.

31

[s]hareholders of a controlled foreign corporation (a 'CFC') to recognize certain types of income based on [a] CFC's earnings ('Subpart F Inclusions'), regardless of whether the U.S. [s]hareholders realize any income from the CFC in the form of a dividend." (ECF No. 1 ¶ 18 (emphasis omitted).)

By striking § 958(b)(4) in the TCJA, Congress expanded the definition of a CFC and a U.S. shareholder, which is consistent with subpart F's overarching purpose of preventing U.S. taxpayers from delaying taxes on foreign-derived income indefinitely.[19] Thus, taxing Altria in this manner cannot be said to be the "exceptionally rare" example of an "absurd" outcome that is "so gross as to shock the general moral or common sense." *Sigmon Coal*, 226 F.3d at 304 (cleaned up). While Altria champions its alternative interpretation of subpart F that would substantially reduce its tax liability, courts "are not simply free to ignore unambiguous language because [they] can imagine a preferable version." *Barnhart*, 534 U.S. at 450 (quotation marks and citation omitted).[20]

---

[19] As explained above, post-TCJA, when determining under subpart F whether a foreign corporation is a CFC and whether a U.S. Person is a U.S. shareholder, stock owned by a foreign person is attributed to any corporation of which that foreign person owns more than 50 percent. *See* 26 U.S.C. § 958.

[20] In its Opposition, Altria identifies an amendment submitted by Senator David Purdue, (the "Purdue Amendment") which prescribed:

> Notwithstanding [section 318(a)], a foreign corporation shall not be considered a controlled foreign corporation with respect to a United States shareholder if the ownership requirements of subsection (a) would not be satisfied with respect to such foreign corporation but for the attribution under section 318(a)(3) (pursuant to section 958(b)) of ownership to a United States person that is not a related person with respect to such United States shareholder.

(ECF No. 56, at 35 (citing 163 Cong. Rec. S7573 (daily ed. Nov. 30, 2017).) Altria concedes that the Purdue Amendment "was never formally proposed." (ECF No. 56, at 35.) But Altria points to colloquies on the senate floor between Senator Purdue and Chair Orrin Hatch, highlighting Chair Hatch's observation that "'the reason [Senator Perdue's amendment] was not

The Court next turns to Altria's final argument—that the inclusion of its pro rata share of the Contested CFCs' income in its 2017 federal taxable income violates the Due Process Clause of the Fifth Amendment.

### C. The Substantial Variance Doctrine Does Not Bar Any Portion of Altria's Fifth Amendment Due Process Argument

The United States argues that to the extent Altria argues that the Fifth Amendment Due Process clause requires Altria to have adequate "control" for its tax to be constitutional, it is barred by the substantial variance doctrine. (ECF No. 54, at 35–36; ECF No. 65, at 34.) Drawing all reasonable inferences in favor of Altria, Altria's Second Amended Refund Claim put the IRS on adequate notice that the concept of "control" would be relevant to the adjudication of its Fifth Amendment claim. *See, e.g.*, *Oosterwijk v. United States*, No. CV 21-1151, 2022 WL

---

adopted is because it was not needed to reflect the intent of the Senate Finance Committee or the conferees for the Tax Cuts and Jobs Act.'" (ECF No. 56, at 36 (citing 163 Cong. Rec. S8110 (daily ed. Dec. 19, 2017).) Altria asks the Court to infer from this never-proposed and unadopted amendment and commentary on the senate floor that "Congress did not intend to inflict tax consequences on taxpayers in Altria's position." (ECF No. 56, at 36.) The Court will not make this inference based on such a thin reed.

Here, the TCJA unambiguously struck § 958(b)(4). *See* Dec. 22, 2017, Pub. L. No. 115-97 § 14213(a), 131 Stat. 2054, 2217 ("striking paragraph (4)" in § 958(b)). Unlike in *Alvord* or *Marsman*, as discussed above, this change is consistent with subpart F's overarching purpose of preventing U.S. shareholders from parking foreign-derived income abroad and delaying realization indefinitely. With that in mind, last-minute colloquies and never-proposed amendments cannot and should not abrogate unambiguous law written by Congress and signed into law by the President. As the Supreme Court has cautioned, "only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives." *Bostock*, 590 U.S. at 654–55; *see also Texas Mun. Power Agency v. E.P.A.*, 89 F.3d 858, 875 (D.C. Cir. 1996) (courts should use "extreme caution" when considering statements made by lawmakers, and "[t]his caution is especially warranted when . . . it appears that a colloquy was a direct result of a single member attempting to reassure his own constituency or even to create legislative history for citation by courts.") (cleaned up).

255348, at *4 (D. Md. Jan. 27, 2022). The Court will consider the entirety of Altria's Due Process clause argument on the merits.

### 1.    Legal Standard:  The Substantial Variance Doctrine

Section 7242(a) of the Internal Revenue Code prohibits a taxpayer from suing the United States for an income tax refund until after the taxpayer has timely filed a refund claim at the IRS in the manner prescribed by regulations. *See* § 7422(a). The regulations provide that "[t]he claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." Treasury Reg. § 301.6402-2(b)(1).

"[A] taxpayer is barred from raising in a refund suit grounds for recovery which had not previously been set forth in its claim for refund." *Bowles v. United States*, 820 F.2d 647, 648–49 (4th Cir. 1987) (internal quotation marks omitted); *see also Lockheed Martin Corp. v. United States*, 210 F.3d 1366, 1371 (Fed. Cir. 2000) ("Courts have long interpreted § 7422(a) and Treasury Reg. § 301.6402–2(b)(1) as stating a 'substantial variance' rule" that "bars a taxpayer from presenting claims in a tax refund suit that 'substantially vary' the legal theories and factual bases set forth in the tax refund claim presented to the IRS.") (citation omitted).

"The substantial variance rule (1) gives the IRS notice as to the nature of the claim and the specific facts upon which it is predicated; (2) gives the IRS an opportunity to correct errors; and (3) limits any subsequent litigation to those grounds that the IRS had an opportunity to consider and is willing to defend." *Lockhead Martin*, 210 F.3d at 1371.[21] To accomplish these goals, "[a] refund claim need not provide a perfectly detailed explanation of the taxpayer's legal

---

[21] Under certain circumstances, the IRS "can waive this requirement and consider grounds for recovery not raised by the taxpayer in their claim for refund." *Bowles*, 820 F.2d at 649. Neither party argues that such waiver has occurred here.

theory . . . or develop a complete factual background of the claim." *Oosterwijk*, 2022 WL

255348, at *4 (taxpayers put IRS on notice of issues in its refund claim where a "reasonable IRS

employee reading [the] claim would understand [those] issues were at play"); *see, e.g., Edde v.*

*United States*, 217 Ct. Cl. 690, 692 (1978) (where "the wording of the [refund] claim straddled

sections 165 and 166, referring specifically to neither", the refund claim "was sufficient to alert

the Commission that taxpayers might predicate their claim on section 165 as well as on section

166.")

### 2. Altria's Refund Claim Adequately Placed the IRS On Notice that Its Lack of Control Over the Contested CFCs Is Integral to its Fifth Amendment Arguments

In its Complaint, Altria asserts that "[i]mposing tax under subpart F where, as here, the

U.S. [s]hareholder has no control over a foreign corporation violates the Fifth [] Amendment."

(ECF No. 1 ¶ 85(d).)  The United States contends that, due to the substantial variance doctrine,

"Altria cannot argue that the Fifth Amendment Due Process Clause imposes a 'control'

requirement because Altria did not include that legal theory in its refund claim."  (ECF No. 54, at

35.)  Altria disagrees, citing to its Second Amended Refund Claim.  (ECF No. 56, at 53.)[22]

Altria points to the following portion of the procedural background in this document, which

provides:

> [The United States'] interpretation of the foreign attribution provision in the
> TCJA, which taxes Altria on the [s]ubpart F Income of the [Contested CFCs] even
> though Altria exercises no control over them, is contrary to clearly expressed
> legislative intent, wholly undermines the subpart F regime, produces absurd
> results and runs afoul of core constitutional principles.

---

[22] The Refund Claim, dated July 18, 2019, consolidates Altria's "original Claim for
Refund filed on January 17, 2019, and the First Amended Claim for Refund filed February 12,
2019."  (ECF No. 1-1, at 2.)  Neither Altria's original Claim for Refund nor its First Amended
Claim for Refund provide any arguments based on the Fifth Amendment's Due Process Clause.
(*See* ECF No. 1-1 at 13–24.)

(ECF No. 1-1, at 3–4; ECF No. 56, at 53.)  In its statement of facts, Altria writes that it lacks control over both ABI and the Contested CFCs. (ECF No. 1-1, at 6.)  The Second Amended Refund Claim explicitly discusses Altria's lack of control over the Contested CFCs as a basis for relief in (1) its statutory interpretation arguments, (*see* ECF No. 1-1, at 7–9); and (2) in its since-retracted Sixteenth Amendment argument, (ECF No. 1-1, at 10).

The Second Amended Refund Claim's Fifth Amendment argument does not explicitly raise any "control" theory of relief, and instead focuses on the purported arbitrariness of taxing it based on the income of another. (*See* ECF No. 1-1, at 11 (arguing that "[t]axing one person on the income earned by another person has been held to constitute an arbitrary tax in violation of the Fifth Amendment" and therefore, "taxing Altria on the income of another juridical entity — the Wholly Foreign Subsidiaries [i.e., the Contested CFCs — is unconstitutional").)

Altria concedes in its opposition that the Fifth Amendment section of its Second Amended Refund Claim "did not cite subpart F's [purported] control requirement." (ECF No. 56, at 54.)  While this is certainly true regarding the body of this section, Altria also includes a footnote in this section that follows a parenthetical.  The parenthetical states: "One person cannot be taxed on income belonging to another." (ECF No. 1-1, at 11 (citation and quotation marks omitted.)  The accompanying footnote provides:  "Altria is not challenging the application of subpart F to foreign corporations that are actually controlled by U.S. persons." (ECF No. 1-1, at 11 n.14.)  Viewed in the light most favorable to Altria, this footnote can be read as stating that to the extent Altria challenges the constitutionality of subpart F's foreign income attribution under the Fifth Amendment, it only does so with respect to foreign corporations that are *not* "actually controlled by U.S. persons."

At a more general level, the concept of Altria's lack of control over ABI's business and the Contested CFCs' income are both fundamental predicates of its Second Amended Refund Claim. It is difficult to fairly characterize Altria's Fifth Amendment argument without referencing, or at least keeping in mind, this lack of control as factual background. While Altria certainly could have presented its control-based Fifth Amendment argument more explicitly, the law does not require taxpayers to "provide a perfectly detailed explanation of" their legal theories in refund claims. *Oosterwijk*, 2022 WL 255348, at *4. A contrary requirement would unfairly penalize taxpayers, especially those who are unsophisticated. It would also incentivize them to present unnecessarily lengthy refund claims in an attempt to avoid running afoul of the substantial variance rule. Indeed, a reasonable IRS employee reviewing Altria's claim would understand that Altria's factual contention that it lacks control over both ABI and the Contested CFCs looms large over the entirety of its Second Amended Refund claim, and would likely be at play in its Fifth Amendment due process argument. As a result, the substantial variance rule does not bar this argument. *See Oosterwijk*, 2022 WL 255348, at *4.

The Court now turns to the merits of Altria's Fifth Amendment claim.

**D.    Altria's Fifth Amendment Due Process Rights Have Not Been Violated**

Altria argues that taxing its pro rata share of foreign entities' income is unconstitutionally arbitrary where Altria lacks control over the foreign corporations whose income gave rise to its tax. (ECF No. 56, at 51–53; ECF No. 1 ¶ 85(d).) For the reasons articulated below, the Court concludes otherwise. First, subpart F's post-TCJA expansion furthers the Congressional purpose of preventing U.S. shareholders from delaying U.S. taxation indefinitely, and therefore is not arbitrary. Second, highly persuasive guidance provided by the Supreme Court in *Moore* strongly

supports the conclusion that Altria's tax is constitutional even where it lacks control over ABI and the Contested CFCs.

### 1.    Legal Standard:  Taxable Income Attribution and Due Process

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. CONST amend. V.

"Except in rare and special instances,[] the" Due Process Clause "is not a limitation upon the taxing power conferred upon Congress by the Constitution." *A. Magnano Co. v. Hamilton*, 292 U.S. 40, 44 (1934). A federal tax statute runs afoul of the Fifth Amendment where it is "so arbitrary as to compel the conclusion that it does not involve an exertion of the taxing power, but constitutes, in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property." *Id.* at 44. This principle remains good law today. *See Moore*, 602 U.S. at 599 ("the Due Process Clause proscribes arbitrary attribution" with respect to taxable income). A tax is not arbitrary where "the Congressional purpose was valid[] and the method of taxation was a reasonable means to achieve the desired ends." *Eder v. Comm'r*, 138 F.2d 27, 29 (2d Cir. 1943).

In *Moore*, a Fifth Amendment due process issue was not before the Supreme Court. *See* 602 U.S. at 590 n.4. Nonetheless, the *Moore* Court announced general principles that are applicable to the attribution of income under subpart F post-TCJA.[23] *Moore* noted that since 1938, "it has gone without serious question in both Congress and the federal courts that Congress

---

[23] Although lower courts are not bound by Supreme Court dicta, they are nonetheless "obliged to afford [it] great weight." *Hengle v. Treppa*, 19 F.4th 324, 347 (4th Cir. 2021) (citation and internal quotation marks omitted). This is especially true when courts are "grappling with complex legal questions of first impression . . . so as to ensure the consistent and uniform development and application of the law." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 282 (4th Cir. 2019). It is also true that courts may not "ignore the Supreme Court's explicit guidance by simply labeling it 'dicta.'" *Hengle*, 19 F.4th at 346.

can attribute the undistributed income of an entity to the entity's shareholders or partners, and tax the shareholders or partners on their pro rata share of the entity's undistributed income." *Id.* at 586–87. The *Moore* Court confirmed that "courts have repeatedly invoked that principle in upholding subpart F, which . . . treats certain foreign corporations as pass-throughs by attributing undistributed income of foreign corporations to their American shareholders, and then taxing the American shareholders on their pro rata shares of the income." *Id.* at 587 (remarking that against this backdrop, "[t]he constitutional challenge to subpart F 'borders on the frivolous'") (collecting cases).

### 2. Taxing Altria On Its Pro Rata Share of the Contested CFC's Income is Not Unconstitutionally Arbitrary

Here, the United States has attributed Altria's pro rata share of 10.2 percent of the Contested CFCs' subpart F income to Altria. Altria contends that this tax is unconstitutionally arbitrary because Altria lacks control over the foreign corporations whose income gave rise to its tax. (ECF No. 56, at 51–53; ECF No. 1 ¶ 85(d).)

Subpart F taxes U.S. shareholders, including Altria, based on—and limited to—their own ownership interest in foreign subsidiaries' income. This is not the "rare and special" instance of a tax law amounting to a confiscation of property in violation of the Fifth Amendment. *Hamilton*, 292 U.S. at 44. As explained above, by striking § 958(b)(4) in the TCJA, Congress expanded the definition of a CFC and a U.S. shareholder, which is consistent with subpart F's overarching purpose of preventing U.S. taxpayers from delaying taxation on foreign-derived income indefinitely. Thus, the TCJA's alteration of subpart F is a "reasonable means to achieve the desired ends", and therefore is not unconstitutionally arbitrary. *Eder*, 138 F.2d at 29.

In *Moore*, as noted above, a Fifth Amendment due process issue was not before the Supreme Court. *See* 602 U.S. at 590 n.4. Nonetheless, *Moore*'s dicta and its collection of

authorities repeatedly upholding subpart F supports the notion that subpart F's 10 percent ownership threshold ensures that it is not unconstitutionally arbitrary. *See id.* at 596–97. Thus, dicta in *Moore* strongly suggests that the Supreme Court, if presented with this question, would rule in the United States' favor as to this issue.

Just as the Supreme Court rejected the Moores' Sixteenth Amendment arguments, the Court is unable to discern any reason to rule differently as to Altria's Fifth Amendment claim. *Moore* acknowledges that there are, of course, "due process limits on attribution to ensure that the attribution is not arbitrary—for example, limits based on the taxpayer's relationship to the underlying income." *Id.* at 590 n.4. At the same time, however, *Moore* states that "[t]he [Supreme] Court's longstanding precedents plainly establish that, when dealing with an entity's undistributed income, Congress may tax either (i) the entity or (ii) its shareholders or partners." *Id.* at 589–90. "'In a variety of circumstances it has been held that the fact that the distribution of income is prevented by operation of law, or by agreement among private parties, is no bar to its taxability.'" *Id.* at 587 (quoting *Eder*, 138 F.2d at 28). In *Garlock*, the Second Circuit rejected a constitutional challenge to subpart F, writing that such a challenge "borders on the frivolous in the light of this court's decision in *Eder*." *Garlock*, 489 F.2d at 202 (passage quoted by *Moore* with approval, *see* 602 U.S. at 587); *see also Whitlock's Est. v. Comm'r*, 494 F.2d 1297, 1301 (10th Cir. 1974) (case cited by *Moore* with approval, *see* 602 U.S. at 587) (rejecting Fifth Amendment due process claim that was predicated on subpart F "ignor[ing] the separate entity of the corporation").

In rejecting the Moores' "claim that constructive realization turns on a sufficient degree of control over the entity", *Moore* noted that "the level of shareholder control with the MRT (at least 10 percent) is the same as under the longstanding subpart F tax." *Id.* at 596. *Moore*

ultimately concluded, albeit with only a Sixteenth Amendment issue squarely before it, that "the Moores cannot meaningfully distinguish the MRT from similar taxes such as taxes on partnerships, on S corporations, *and on subpart F income*", and "the Moores' argument, taken to its logical conclusion, could render vast swaths of the Internal Revenue Code unconstitutional." *Id.* at 597 (citing numerous sections of the Internal Revenue Code, including subpart F) (emphasis added).  A contrary holding, *Moore* explained, "would deprive the U.S. Government and the American people of trillions in lost tax revenue", and "[t]he Constitution does not require that fiscal calamity." *Id.* at 597.  The Court will likewise decline to impose such a financial burden here.

### IV.  Conclusion

For the reasons articulated above, the Court will grant the United States' Motion for Judgment on the Pleadings on Count I of Altria's Complaint (the "Motion for Judgment on the Pleadings" or "Motion").  (ECF No. 53.)

It is SO ORDERED.

Date: 09/29/25
Richmond, Virginia

_____
/s/
M. Hannah Lauck
United States District Judge